UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
                                        :      18cv2933(DLC)
 IN RE LONGFIN CORP. SECURITIES CLASS   :
 ACTION LITIGATION                      :      OPINION AND
                                        :          ORDER
----------------------------------------X
Appearances:

For the plaintiffs:
Christopher James Kupka
Eduard Korsinsky
Levi & Korsinsky, LLP
55 Broadway, 10th Floor
New York, NY 10006

Donald J. Enright
Elizabeth K. Tripodi
John A. Carriel
Levi & Korsinsky LLP (DC)
1101 30th, Street, NW
Washington, DC 20007

For defendant Network 1:
Peter George Siachos
Jack I. Siegal
Gordon Rees Scully Mansukhani
18 Columbia Turnpike N.
Florham Park, NJ 07932

DENISE COTE, District Judge:

     This is a federal securities class action brought against

defendants Longfin Corp ("Longfin"), Venkata S. Meenavalli

("Meenavalli"), Vivek Kumar Ratakonda ("Ratakonda"), Andy

Altahawi ("Altahawi," and together with Meenavalli, and

Ratakonda, the "Executive Defendants"), Suresh Tammineedi

("Tammineedi"), Dorababu Penumarthi ("Penumarthi"), (with the

Executive Defendants, "Individual Defendants"), and Network 1

Financial Securities Inc. ("Network 1," and together with the other defendants, "Defendants") on behalf of investors who purchased Longfin's stock.

This Opinion addresses the motions to dismiss filed by Tammineedi, Penumarthi and Network 1.  Tammineedi and Penumarthi have moved to dismiss for lack of personal jurisdiction pursuant to Fed. R. Civ. P. 12(b)(2) and Network 1 has moved to dismiss for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6).  For the reasons that follow, Network 1's motion is granted in part and Tammineedi and Penumarthi's motions are denied.

## BACKGROUND

The following facts are taken from the First Amended Complaint ("FAC") and documents attached to and incorporated in it by reference.  They are taken in the light most favorable to the plaintiffs.  This Opinion also incorporates by reference and assumes familiarity with the description of the alleged Longfin scheme and statutory framework for these claims, as set forth in a May 1, 2018 Opinion granting a preliminary injunction in a related SEC enforcement action.  See Sec. & Exch. Comm'n v. Longfin Corp., 316 F. Supp. 3d 743 (S.D.N.Y. 2018).

Longfin describes itself as a finance and technology corporation that provides foreign exchange and finance

solutions.  It purports to be an American corporation headquartered in New York.  Longfin and its associates are accused of perpetrating a securities fraud that included false statements and insider trading.

Tammineedi is a citizen and resident of India.  He is the former director of two entities related to Longfin.  Penumarthi is a citizen and resident of the United Kingdom.  He has described himself as the "head of Longfin's United Kingdom operations".  Network 1 is a registered broker-dealer located in Red Bank, New Jersey.

Longfin's Regulation A+ Offering

Longfin publicly offered its shares for the first time in 2017 through what is known as a Regulation A+ offering.  See Longfin, 316 F. Supp. 3d 743 (describing Regulation A+ offerings).  On June 16, 2017, the SEC first qualified Longfin's Regulation A+ offering.

Longfin retained Network 1 as its lead underwriter for its Regulation A+ offering on August 21, 2017.  According to its underwriting agreement ("Underwriter Agreement"), Network 1 was to act on a "best efforts basis" to issue and sell Longfin shares in an initial public offering.  In exchange, Longfin would pay Network 1 a fee, issue it "Underwriter's Warrants," and reimburse it for all expenses.  The Underwriter Agreement provided that investors would purchase Longfin shares through

broker transactions and that payment for such purchases would be placed in a segregated bank account.

In the Agreement, Longfin represented that its Offering Statement and the company's Amended Final Offering Circular "present fairly, in all material respects, the financial condition of the Company."  Longfin also agreed that it would "use its reasonable best efforts to ensure" that its shares are listed for trading on the NASDAQ.  Network 1 represented that it would not use or distribute written offering materials other than the Amended Final Offering Circular, and would make no representations inconsistent with those made in the Longfin Offering Statement.  Network 1's obligations under the agreement were subject to, inter alia, Longfin furnishing certain certificates to Network 1, including any certificates "reasonably requested as to the accuracy and completeness" of statements made by the company in connection with its offering.

Longfin began issuing shares under its Regulation A+ offering on September 1, 2017.  As per its underwriting agreement with Longfin, Network 1 was to receive a percentage of the gross proceeds from the first 3,000,000 shares sold in the offering.  Network 1 ultimately received $438,757 in commissions based on 1,140,989 shares sold.

Longfin's Listing on NASDAQ

On August 11, 2017, Longfin submitted its application for listing on NASDAQ.  The FAC alleges that Network 1 -- along with Altahawi, Longfin's then-Secretary -- were responsible for communicating with NASDAQ regarding Longfin's application.

Under NASDAQ Listing Rule 5505(a), a company seeking to list its equity securities must have, inter alia, at least 1,000,000 publicly-held shares, defined as shares not directly or indirectly held by an officer, director, or "any person who is the beneficial owner of more than 10 percent of the total shares outstanding."  On November 15, NASDAQ approved Longfin's listing.

On November 22, the SEC qualified a November 3 Longfin Amended Offering Statement.  This qualified Longfin to conduct an offering of up to 10 million Class A shares for $5.00 per share with a minimum purchase amount of 100 shares.  On November 29, Longfin informed NASDAQ that it anticipated listing its Class A Stock on December 11, 2017.

On December 4, Network 1 requested updated information from Altahawi on Longfin's issued shares to use in its communications with NASDAQ.  At Altahawi's instruction, Longfin's transfer agent provided Network 1 with a list of issuances and a reconciliation document detailing the deposits and remittances associated with issuances.

By December 6, Longfin was still short of NASDAQ's requirement that it have issued 1,000,000 publicly-held shares. One of the fraudulent transactions at the heart of this action is alleged to have occurred on that day to assist in getting Longfin listed on the NASDAQ.  Longfin issued 409,360 Class A shares to 24 individuals for $0 in consideration ("December 6 Shares").

Longfin promptly informed NASDAQ that it would close its offering on December 7, and list its Class A Stock on December 13.  The individuals who received the December 6 Shares include Longfin insiders such as Tammineedi and Penumarthi and officers such as Ratakonda.  Tammineedi received 30,000 shares and Penumarthi received 40,000 shares.  Later, through trading on the open market, Tammineedi sold 2,200 of his December 6 Shares for $127,335, and Penumarthi sold 39,800 of his December 6 Shares for $1,531,187.39.

On December 7, Altahawi sent Network 1 an updated list of shareholders that included the 24 individuals who had received December 6 Shares and informed Network 1 that Longfin wished to close the Regulation A+ Offering that day.  In response, Network 1 requested "the list of people that invested" and "proof of Funds received."  Altahawi provided Network 1 with a list of the 24 individuals who received December 6 Shares and bank statements purportedly containing payment information for these

shares.  Plaintiffs allege that the December 6 Shares were never paid for and the bank statements did not actually contain proof of funds received.

On December 11, Altahawi informed NASDAQ that Longfin had sold 1,140,989 Class A shares under its Regulation A+ Offering to 364 shareholders.  Beginning on December 13, Longfin's Class A Shares were listed on NASDAQ under the ticker symbol "LFIN." On December 13 and 14, Tammineedi purchased 67,000 additional shares of Longfin Class A Stock.  Tammineedi later sold these shares for a profit of $2.7 million.

Around December 21, in response to requests by Tammineedi, Penumarthi, and five additional December 6 shareholders to open brokerage accounts, Network 1 asked Altahawi to confirm that these shareholders had paid for their shares.  Altahawi again provided Network 1 with bank statements that purportedly showed payment for the stocks.  Plaintiffs allege that the two escrow accounts used in connection with Longfin's Regulation A+ offering and Longfin's bank account do not actually contain evidence of payments made for the December 6 Shares.

<u>Longfin's Press Releases and SEC Investigation</u>

Between December 13 and March 22, 2018, Longfin issued a series of false and misleading press releases announcing its acquisition of a "[b]lockchain technology empowered solutions provider" named Ziddu.com, a multi-billion dollar investment in

the company, and the company's listing on performance indexes. In response, the price of Longfin's Class A stock skyrocketed.

Between March 26 and April 3, 2018, Longfin's stock price fell precipitously following disclosure of, inter alia, the SEC investigation.  On April 6, the SEC announced it had acquired a court order freezing $27 million in trading proceeds from allegedly illegal sales of Longfin Class A stock.  That same day, NASDAQ announced that it was halting the trading of Longfin's Class A Stock.  On May 24, Longfin stock was officially delisted from NASDAQ and began trading on the over-the-counter market.

Plaintiffs allege that Tammineedi and Penumarthi sold their Longfin shares while in possession of material non-public information and neglected their duty to disclose such information or abstain from trading.  They allege as well that Tammineedi breached his duty as an executive employee of Longfin to refrain from trading Longfin stock.

## Procedural History

Plaintiffs filed this action on April 3, 2018 on behalf of a class consisting of all persons and entities, other than the defendants and their affiliates, who purchased Longfin's Class A common stock between December 13, 2017 and April 6, 2018.  The plaintiffs filed the FAC on July 27.

The FAC asserts five causes of action: (1) that all Defendants are liable under Section 12(a)(1) of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. § 77l(a)(1), for selling unregistered securities in violation of Section 5 of the Securities Act, 15 U.S.C. § 77e(a); (2) that the Executive Defendants are liable for the Section 12(a)(1) violation as control persons under Section 15(a) of the Securities Act, 15 U.S.C. § 77o; (3) that all Defendants committed fraud in violation of Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5; (4) that the Individual Defendants are liable for the Section 10(b) violation as control persons under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a); and (5) that Altahawi, Tammineedi, and Penumarthi engaged in insider trading in violation of Section 20A of the Exchange Act, 15 U.S.C. § 78t-1(a).

Network 1 filed a motion to dismiss the FAC pursuant to Fed. R. Civ. P. 12(b)(6) and the Private Securities Litigation Reform Act ("PSLRA") on September 25, 2018.  Penumarthi and Tammineedi filed motions to dismiss the FAC pursuant to Fed. R. Civ. P. 12(b)(2) on October 11 and October 18, respectively.[1]

---

[1] On January 4, 2019, a default was entered against Longfin.  On January 22, a default was entered against Meenavalli and Ratakonda.

The SEC brought a related securities action on April 4, 2018, alleging that defendants Longfin, Meenavalli, Altahawi, Penumarthi, and Tammineedi violated Section 5 of the Securities Act by selling securities of Longfin in violation of the registration requirements of the Securities Act.  A Temporary Restraining Order ("TRO") was issued on April 4, which froze certain accounts associated with Altahawi, Tammineedi, Penumarthi, Longfin, and Meenavalli.  On April 23, the TRO was vacated with respect to Longfin and Meenavalli.  On May 1, 2018, this Court granted the SEC's motion for a preliminary injunction, in effect extending the TRO as to Altahawi, Tammineedi, and Penumarthi.  Longfin, 316 F. Supp. 3d at 755. The May Opinion found, inter alia, that the SEC was likely to succeed in showing that Tammineedi and Penumarthi sold unregistered shares of Longfin stock in violation of Section 5 of the Securities Act when they sold shares they acquired on December 6, 2017.  Id. at 769.

## Discussion

Network 1's Motion to Dismiss

Network 1 has moved to dismiss the FAC under Fed R. Civ. P. 12(b)(6) and the PSLRA.  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."

Sierra Club v. Con-Strux, LLC, 911 F.3d 85, 88 (2d Cir. 2018) (citation omitted).  A claim to relief is plausible when the factual allegations in a complaint "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Progressive Credit Union v. City of New York, 889 F.3d 40, 48 (2d Cir. 2018) (citation omitted). "[T]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Carlin v. Davidson Fink LLP, 852 F.3d 207, 212 (2d Cir. 2017). The plaintiff must plead enough facts to "nudge[] [his] claims across the line from conceivable to plausible . . . ." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007).

When a party moves to dismiss for failure to state a claim upon which relief can be granted under Rule 12(b)(6), Fed. R. Civ. P., a court must "constru[e] the complaint liberally, accept[] all factual allegations as true, and draw[] all reasonable inferences in the plaintiff's favor."  Coalition for Competitive Electricity, Dynergy Inc. v. Zibelman, 906 F.3d 41, 48-49 (2d Cir. 2018) (citation omitted).  "A complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference." Nicosia v. Amazon.com, Inc., 834 F.3d 220, 230 (2d Cir. 2016) (citation omitted).  A court may also consider documents that are "integral to the complaint."  Goel v. Bunge, Ltd., 820 F.3d

554, 559 (2d Cir. 2016).  "A document is integral to the complaint where the complaint relies heavily upon its terms and effect."  Id.  A court may consider "documents that the plaintiffs either possessed or knew about and upon which they relied in bringing the suit . . . ."  Rothman v. Gregor, 220 F.3d 81, 88 (2d Cir. 2000).  A court may also take judicial notice of "relevant matters of public record."  Giraldo v. Kessler, 694 F.3d 161, 164 (2d Cir. 2012).

Claims that sound in fraud must be plead with particularity pursuant to Fed. R. Civ. P. 9(b).  U.S. ex rel. Polansky v. Pfizer, Inc., 822 F.3d 613, 617-18 (2d Cir. 2016).  "To satisfy this Rule, a complaint alleging fraud must (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent."  United States ex rel. Ladas v. Exelis, Inc., 824 F.3d 16, 25 (2d Cir. 2016) (citation omitted).

Where a party moves to dismiss securities fraud allegations,

> section 21D(b)(2) of the PSLRA, which governs scienter pleading in securities fraud actions, establishes a more stringent rule for inferences involving scienter, and requires that a plaintiff's complaint state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.

Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc., 531 F.3d 190, 194 (2d Cir. 2008) (citation omitted).  An inference of scienter is "strong" and a complaint will survive if "a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged."  Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 324 (2007).

"The requisite state of mind in a section 10(b) [of the Exchange Act] and Rule 10b-5 action is an intent to deceive, manipulate, or defraud," or, in the alternative, recklessness. ECA, Local 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co., 553 F.3d 187, 198 (2d Cir. 2009) (citation omitted). Section 10(b) claims therefore sound in fraud, and must satisfy the pleading requirements of Rule 9(b) and the PSLRA by "stating with particularity the circumstances constituting fraud."  Id. at 196.  To state a claim under Section 12(a)(1) of the Securities Act, a plaintiff need not plead scienter, reliance, or fraud.  Rombach v. Chang, 355 F.3d 164, 169 n.4 (2d Cir. 2004).  But the Second Circuit has determined that the wording of Federal Rule of Civil Procedure 9(b) "is cast in terms of the conduct alleged, and is not limited to allegations styled or denominated as fraud or expressed in terms of the constituent elements of a fraud cause of action."  Id. at 171.  Therefore, "the heightened pleading standard of Rule 9(b) applies to . . .

Section 12[] claims insofar as the claims are premised on allegations of fraud."  Id.

  I. Section 12(a)(1) Claim

     The plaintiffs bring two counts against Network 1, the first under Section 12(a)(1) of the Securities Act.  The plaintiffs claim that Network 1 and all other Defendants violated Section 12(a)(1) by offering or selling a security in violation of Section 5 of the Securities Act.  The parties agree that claims under Section 12(a)(1) are not governed by the heightened PSLRA pleading standard for claims of securities fraud.

     Section 12(a)(1) provides in relevant part that

     Any person who--
     (1) offers or sells a security in violation of section
     77e of this title, . . .
     shall be liable, subject to subsection (b), to the
     person purchasing such security from him, who may sue
     either at law or in equity in any court of competent
     jurisdiction, to recover the consideration paid for
     such security with interest thereon, less the amount
     of any income received thereon, upon the tender of
     such security, or for damages if he no longer owns the
     security.
15 U.S.C. § 77l(a)(1) (emphasis supplied).  Section 77e prohibits the sale of unregistered securities.  15 U.S.C. §77e(a).  Regulation A+ was promulgated to create an exemption from the registration requirements for certain categories of offerings.  See Longfin, 316 F. Supp. 3d at 748.

Network 1 argues that the plaintiffs' Section 12(a)(1) allegations against it should be dismissed because Network 1 did not act as a "seller" of securities to the plaintiffs, who purchased their securities on the NASDAQ.  It is correct.

The Supreme Court has held that a plaintiff may assert claims against a party under Section 12 of the Securities Act, even in the absence of contractual privity, so long as it is shown that the defendant "successfully solicit[ed] the purchase, motivated at least in part by a desire to serve his own financial interests or those of the securities owner."  Pinter v. Dahl, 486 U.S. 622, 647 (1988).  The adoption of this rule, which has come to be known as the "statutory seller" standard, see Fed. Hous. Fin. Agency v. UBS Americas, Inc., 858 F. Supp. 2d 306, 333 (S.D.N.Y. 2012), aff'd, 712 F.3d 136 (2d Cir. 2013), was driven in large part by the precise wording of Section 12, which provides, as relevant here: "Any person who . . . offers or sells a security . . . shall be liable . . . to the person purchasing such security from him. . . ."  15 U.S.C. § 77l(a)(2).

The Court in Pinter noted in particular that the Securities Act defines the terms "offer to sell," "offer for sale," or "offer" to include "every attempt or offer to dispose of, or solicitation of an offer to buy, a security or interest in a security, for value."  Pinter, 486 U.S. at 643 (citing 15 U.S.C.

15

§ 77b(b)(3)).  From this, it concluded that "[t]he inclusion of
the phrase 'solicitation of an offer to buy' within the
definition of 'offer' brings an individual who engages in
solicitation, an activity not inherently confined to the actual
owner, within the scope of § 12."  Id.  "[W]hen a broker acting
as agent of one of the principals to the transaction
successfully solicits a purchase, he is a person from whom the
buyer purchases within the meaning of § 12 and is therefore
liable as a statutory seller."  Id. at 646.  The Court
explained:

> [B]rokers and other solicitors are well positioned to
> control the flow of information to a potential
> purchaser, and, in fact, such persons are the
> participants in the selling transaction who most often
> disseminate material information to investors.  Thus,
> solicitation is the stage at which an investor is most
> likely to be injured, that is, by being persuaded to
> purchase securities without full and fair information.

Id. at 646-47.

The Court in Pinter, however, declined to extend the
definition of seller under Section 12(a)(1) to include
"participants' collateral to the offer or sale."  Id. at 650.
Under Section 12(a)(1) the "buyer does not, in any meaningful
sense, 'purchas[e]' the security from . . . participants only
remotely related to the relevant aspects of the sales
transactions" such as those whose "involvement is only the
performance of their professional services."  Id. at 651.

16

Underwriters may, in certain circumstances, be liable as sellers under Section 12.

> In a firm commitment underwriting, the underwriter agrees to purchase an agreed upon percentage of the offering irrespective of whether the securities can be sold in the public market; therefore, the underwriter bears the risk if the offering is undersubscribed . . . [and] is thus the owner of any unsold shares and can be liable as a 'seller' for direct sales to the public

for purposes of Section 12.  In re WorldCom, Inc. Sec. Litig., 294 F. Supp. 2d 392, 409 (S.D.N.Y. 2003).

The FAC asserts that Network 1 acted as lead underwiter for its Regulation A+ Offering and was instrumental in getting Longfin shares listed on the NASDAQ.  This is insufficient to state a Section 12(a)(1) violation for sales of Longfin shares to the class over the NASDAQ.

The plaintiffs urge that but for Network 1's actions, the Longfin stock "would not have been listed" on the NASDAQ. Again, this is insufficient to deem Network 1 a "seller" of Longfin shares purchased on the NASDAQ.[2]  There is no allegation that Network 1 acted as a broker for the plaintiff's' purchases, owned the shares sold to the plaintiffs, or solicited those purchases.  Network 1's assistance in the initial public

---

[2] Network 1 argues that the plaintiffs' Section 12(a)(1) allegations are grounded in fraud, and so must be pled with Rule 9(b) particularity.  Because the FAC fails to allege that Network 1 was a "seller" for purposes of Section 12(a)(1), it is unnecessary to reach this issue.

offering and in the NASDAQ listing process did not make it a seller of Longfin shares on the open market.

## II.   Violation of Section 10(b) of the Exchange Act and Rule 10b-5.

The plaintiffs claim that Network 1 violated Section 10(b) of the Exchange Act and Rule 10b-5 through its participation in Longfin's allegedly fraudulent and manipulative scheme.  Section 10(b) makes it unlawful to "use or employ . . . any manipulative or deceptive device or contrivance" in violation of any Commission rules and regulations.  15 U.S.C. § 78j(b).  Rule 10b-5, promulgated under Section 10(b), contains three subsections:

> subsection (a) of the Rule makes it unlawful to employ any device, scheme, or artifice to defraud. Subsection (b) makes it unlawful to make any untrue statement of a material fact.  And subsection (c) makes it unlawful to engage in any act, practice, or course of business that operates as a fraud or deceit.

Lorenzo v. Sec. & Exch. Comm'n, No. 17-1077, 2019 WL 1369839, at *4 (U.S. Mar. 27, 2019)(citation omitted).  "To prevail on a claim of market manipulation under § 10(b) and Rule 10b-5, the [plaintiff] must demonstrate that the defendant engaged in manipulative acts with scienter in connection with the purchase or sale of securities on any facility of a national securities exchange."  Sec. & Exch. Comm'n v. Lek Sec. Corp., 276 F. Supp. 3d 49, 59 (S.D.N.Y. 2017)

> In a typical § 10(b) private action a plaintiff must
> prove (1) a material misrepresentation or omission by
> the defendant; (2) scienter; (3) a connection between
> the misrepresentation or omission and the purchase or
> sale of a security; (4) reliance upon the
> misrepresentation or omission; (5) economic loss; and
> (6) loss causation.

Stoneridge Inv. Partners, LLC v. Sci.-Atlanta, 552 U.S. 148, 157

(2008).  But, "[c]onduct itself can be deceptive, and so

liability under § 10(b) or Rule 10b-5 does not require a

specific oral or written statement."  United States v. Finnerty,

533 F.3d 143, 148 (2d Cir. 2008) (citation omitted).

    In determining whether an act is manipulative, the Second

Circuit requires "a showing that an alleged manipulator engaged

in market activity aimed at deceiving investors as to how other

market participants have valued a security."  Wilson v. Merrill

Lynch & Co., Inc., 671 F.3d 120, 130 (2d Cir. 2011) (citation

omitted).  "The gravamen of manipulation is deception of

investors into believing that prices at which they purchase and

sell securities are determined by the natural interplay of

supply and demand, not rigged by manipulators."  Id. (citation

omitted).  See also Lorenzo, 2019 WL 1369839, at *4; Janus

Capital Group, Inc. v. First Derivative Traders, 564 U.S. 135,

142 (2011).

    Liability under Section 10(b) and Rule 10b-5 also requires

proof of scienter, which the Supreme Court has defined as an

"intent to deceive, manipulate or defraud" or "knowing or

intentional misconduct." Ernst & Ernst v. Hochfelder, 425 U.S. 185, 194 n.12 (1976); see Grandon v. Merrill Lynch & Co., 147 F.3d 184, 194 (2d Cir. 1998). The Second Circuit has held that reckless conduct -- i.e. "conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care" -- satisfies the scienter requirement. SEC v. Obus, 693 F.3d 276, 286 (2d Cir. 2012) (citation omitted). Mere negligence, however, is insufficient. Id. "Proof of scienter need not be direct, but may be a matter of inference from circumstantial evidence." Wechsler v. Steinberg, 733 F.2d 1054, 1058 (2d Cir. 1984) (citation omitted).

Network 1 moves to dismiss the Exchange Act claim for the FAC's failure to allege that it made any false statement. Network 1 may be liable regardless of whether it "made" any misrepresentations or omissions. See Lorenzo, 2019 WL 1369839, at *4. The FAC alleges that Network 1 facilitated Longfin's Regulation A+ Offering and listing on NASDAQ despite knowing that the Longfin shares were issued outside the ambit of Regulation A+'s requirements. Such allegations are adequate to state a claim that Network 1 participated in a scheme cognizable under Rule 10b-5.

The overarching scheme alleged in the FAC required the Longfin shares to be listed on NASDAQ. Only after that listing had been achieved did the conspirators manipulate the market

price through dissemination of false information and make their profits by selling Longfin shares at the artificially inflated prices.  If Network 1 played a significant role in getting Longfin listed on the NASDAQ when it knew that a significant number of Longfin shares were not validly issued pursuant to a Regulation A+ exemption from securities registration requirements and should not be publicly traded, then it violated Section 10(b) and Rule 10b-5.

The closer question is whether the plaintiffs have also adequately plead Network 1's scienter under the PSLRA's heightened pleading requirements.  The FAC alleges that Network 1 knew that the December 6 Shares were not validly purchased pursuant to Regulation A+ but proceeded with the Regulation A+ offering and facilitated the NASDAQ listing in order to gain financially.  The FAC alleges that the bank statements provided to Network 1 by Altahawi did not prove that the December 6 Shares were purchased for consideration.  The FAC also alleges that the list of December 6 shareholders provided to Network 1 identified individuals, such as Ratakonda, who were executives at Longfin or closely affiliated with the company or its employees.  The plaintiffs argue that Network 1 should have understood that the transfer of Longfin shares to such insiders violated NASDAQ's listing requirements.  These facts give rise to a strong inference that Network 1 knew that the December 6

Shares were not validly issued and that the Longfin stock was ineligible for listing on NASDAQ.

Network 1 argues that it is plausible that Longfin provided it with falsified bank records.  It emphasizes that the FAC itself acknowledges that Network 1 requested confirmation that the December 6 Shares had been purchased for consideration. While Network 1 may be able to show in discovery that Longfin gave it falsified records, the FAC adequately alleges that the records provided did not contain proof of payment and that Network 1 was thus aware of the fraudulent scheme.

Tammineedi and Penumarthi's Motions to Dismiss

Defendants Tammineedi and Penumarthi have moved to dismiss the claims against them for lack of personal jurisdiction.  "In order to survive a motion to dismiss for lack of personal jurisdiction, a plaintiff must make a prima facie showing that jurisdiction exists."  SPV Osus Ltd. v. UBS AG, 882 F.3d 333, 342 (2d Cir. 2018) (citation omitted).  "In evaluating whether the requisite showing has been made, [a court must] construe the pleadings and any supporting materials in the light most favorable to the plaintiff[]."  Licci ex rel. Licci v. Lebanese Canadian Bank, SAL, 732 F.3d 161, 167 (2d Cir. 2013).  A plaintiff may not rely on conclusory statements without any supporting facts, as such allegations would "lack the factual specificity necessary to confer jurisdiction."  Jazini v. Nissan

Motor Co., Ltd., 148 F.3d 181, 185 (2d Cir. 1998).

The federal securities laws at issue in this case provide for worldwide service of process and permit the exercise of personal jurisdiction to the limit of the Fifth Amendment's Due Process Clause.  See 15 U.S.C. § 77v[3]; SEC v. Unifund SAL, 910 F.2d 1028, 1033 (2d Cir. 1990) (holding that "the Securities Exchange Act permits the exercise of personal jurisdiction to the limit of the Due Process Clause of the Fifth Amendment").

The Second Circuit applies a two-step test to determine whether exercise of personal jurisdiction over a non-resident is constitutional.  First, a court asks whether the defendant has sufficient "minimum contacts" with the forum, that is, if the defendant "has purposefully directed [its] activities at the forum and the litigation arises out of or relates to those activities."  Gucci America, Inc. v. Weixing Li, 768 F.3d 122, 136 (2d Cir. 2014) (citation omitted).  If the court can establish these minimum contacts, it next determines "whether the assertion of personal jurisdiction is reasonable under the circumstances of the particular case."  Porina v. Marward

---

[3] 15 U.S.C § 77v provides that "[a]ny such suit or action may be brought in the district wherein the defendant is found or is an inhabitant or transacts business, or in the district where the offer or sale took place, if the defendant participated therein, and process in such cases may be served in any other district of which the defendant is an inhabitant or wherever the defendant may be found."

Shipping Co., 521 F.3d 122, 127 (2d Cir. 2008) (citation omitted).

"In determining whether personal jurisdiction exists over a foreign defendant who . . . has been served under a federal service of process provision, a court should consider the defendant's contacts throughout the United States and not just those contacts with the forum." U.S. Titan, Inc. v. Guangzhou Zhen Hua Shipping Co., 241 F.3d 135, 152 n.12 (2d Cir. 2001). The Supreme Court has emphasized that "it is the defendant's actions, not his expectations, that empower a [forum's] courts to subject him to judgment." J. McIntyre Machinery, Ltd. v. Nicastro, 564 U.S. 873, 883 (2011). Therefore, "[t]he principal inquiry" under the Due Process Clause "is whether the defendant's activities manifest an intention to submit to the power of a sovereign." Id. at 882. In other words, it is essential in each case that there be some act by which the defendant "purposefully avails itself of the privilege of conducting activities" within the United States, thus "invoking the benefits and protections of its laws." Id. (quoting Hanson v. Denckla, 357 U.S. 235, 253 (1958)). Moreover, the resulting litigation must be derived "from alleged injuries that arise out of or relate to" that act. Burger King Corp. v. Rudzewicz, 471 U.S. 462, 472-73 (1985) (citation omitted).

If there are minimum contacts, the defendant must "present
a compelling case that the presence of some other considerations
would render jurisdiction unreasonable."  Eades v. Kennedy, PC
Law Offices, 799 F.3d 161, 169 (2d Cir. 2015) (citation
omitted).  Factors in determining whether exercising
jurisdiction is reasonable include:

> (1) the burden that the exercise of jurisdiction will
> impose on the defendant; (2) the interests of the
> forum state in adjudicating the case; (3) the
> plaintiff's interest in obtaining convenient and
> effective relief; (4) the interstate judicial system's
> interest in obtaining the most efficient resolution of
> the controversy; and (5) the shared interest of the
> states in furthering substantive social policies.

Id. (citation omitted).  The ultimate consideration is "fair
play and substantial justice."  Id. (citation omitted).

The allegations against in the FAC provide an adequate
basis for the exercise of personal jurisdiction over Penumarthi
and Tammineedi.  They were associated with Longfin or a related
entity and received Longfin shares on December 6 as part of a
market manipulation scheme.  They profited handsomely from the
sale of some of these shares over NASDAQ.  Their knowing
participation in a securities fraud in the United States
justifies the exercise of jurisdiction over them.

Tammineedi and Penumarthi argue that personal jurisdiction
over them is improper because they do not reside in, do business
in, maintain bank accounts in, or travel regularly to the United

States.  They assert that have never been employed by Longfin

and purchased and/or sold Longfin shares from abroad.[4]  Even if

true (and some of these assertions are in tension with

allegations in the FAC), these assertions do not suggest that

the exercise of jurisdiction over these foreign defendants in

this action is unreasonable.  While both reside far from the

United States, both defendants are already parties to the

related SEC action, which is also before this Court.

Participation in this class action will not add any substantial

burden.  The Defendants' alleged participation in a securities

fraud in connection with an alleged New York issuer and through

trading on a New York-based exchange make the exercise of

jurisdiction reasonable and appropriate.


## Conclusion

Network 1's September 25, 2018 motion to dismiss is granted

as to the Section 12(a)(1) claim and denied as to the Section

---

[4] In his motion to dismiss, Tammineedi states that he used an
account with Western International Securities, Inc. to sell his
shares, but provides no further information about the location
of this company.  Penumarthi claims that he "did not use a
United States broker" to buy and sell his Longfin shares.

10(b) and Rule 10b-5 claim.  Penumarthi's October 11 motion to
dismiss and Tammineedi's October 18 motion to dismiss are
denied.


Dated:     New York, New York
           April 11, 2019


                                    _____
                                           DENISE COTE
                              United States District Judge