# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| IN RE LONGFIN CORP. SECURITIES CLASS ACTION LITIGATION | Lead Case No.: 1:18-cv-2933-DLC CLASS ACTION JURY TRIAL DEMANDED |

## SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

Dated: June 28, 2019

### LEVI & KORSINSKY, LLP

Christopher J. Kupka (CK-9010)
Eduard Korsinsky
55 Broadway, 10th Floor
New York, NY 10006
Telephone: (212) 363-7500
Facsimile: (212) 363-7171

Donald J. Enright
Elizabeth K. Tripodi
John A. Carriel
1101 30th Street, N.W., Suite 115
Washington, DC 20007
Telephone: (202) 524-4290
Facsimile: (202) 337-1567

*Attorneys for Lead Plaintiff Mohammad A. Malik and Plaintiff Karthik Reddy*

## <u>TABLE OF CONTENTS</u>

**Page**

NATURE OF THE ACTION ...................................................................................... 1

JURISDICTION AND VENUE ................................................................................. 7

CLASS ACTION ALLEGATIONS ........................................................................... 8

PARTIES ................................................................................................................... 10

    I.      PLAINTIFFS .......................................................................................... 10

    II.     DEFENDANTS ....................................................................................... 11

SUBSTANTIVE ALLEGATIONS ........................................................................... 14

    I.      LONGFIN'S REGULATION A OFFERING ....................................... 14

          A.      Regulation A ............................................................................... 14

          B.      Longfin's Incorporation and Initiation of the Regulation A Offering ....... 15

          C.      Longfin Begins Issuing Class A Shares and Seeking Listing on NASDAQ ................................................................................. 18

    II.     SALES OF UNREGISTERED LONGFIN CLASS A STOCK ON THE OPEN MARKET IN NON-EXEMPT TRANSACTIONS. ............................................. 24

          A.      Altahawi Sells 536,103 Shares of Unregistered Non-Exempt Longfin Class A Stock on the Open Market for a Profit of $29,016,156.34 .......... 24

          B.      Tammineedi Sells 2,200 of the Unregistered Non-Exempt December 6 Shares for a Profit of $127,335 ................................. 28

          C.      Penumarthi Sells 39,200 of the Unregistered Non-Exempt December 6 Shares for a Profit of  $1,531,187.39 ....................... 29

    III.    ADDITIONAL INSIDER TRADES ....................................................... 30

    IV.    MATERIALLY FALSE AND MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD ......................................................... 31

    V.     THE TRUTH EMERGES IN STAGES ................................................. 43

CONTROL PERSON ALLEGATIONS ...................................................................... 53

THE SECURITIES ACT CLAIMS ........................................................................... 54

COUNT I ................................................................................................................... 55

COUNT II .................................................................................................................. 56

THE EXCHANGE ACT CLAIMS ............................................................................. 57

SCIENTER ALLEGATIONS..........................................................................................57

LOSS CAUSATION....................................................................................................59

APPLICATION OF PRESUMPTION OF RELIANCE:
        FRAUD-ON-THE-MARKET DOCTRINE ...............................................59

NO SAFE HARBOR ...................................................................................................60

COUNT III.................................................................................................................60

COUNT IV.................................................................................................................63

COUNT V...................................................................................................................65

PRAYER FOR RELIEF ..............................................................................................65

Lead Plaintiff Mohammad A. Malik ("Malik" or "Lead Plaintiff"), along with Plaintiff Karthik Reddy ("Reddy," and together with Malik, "Plaintiffs") on behalf of themselves and all other individuals and entities similarly situated, by their undersigned attorneys, make the allegations in this Second Amended Class Action Compliant for Violations of the Federal Securities Laws (the "Complaint") based upon knowledge with respect to themselves and their own acts, and upon facts and information obtained through an investigation conducted by their counsel, which included a review of, *inter alia*: (a) documents and solicitation materials released by Defendants (defined below) in connection with Longfin Corp.'s ("Longfin" or the "Company") initial public offering conducted under Regulation A, and business operations; (b) documents filed with the United States Securities and Exchange Commission ("SEC") by Longfin; (c) securities analyst reports and advisories about the Company; (d) media reports about the Company; and (e) documents filed in a related civil action pending before this Court entitled *SEC v. Longfin Corp., et al.*, No. 1:18-cv-2977-DLC (the "SEC Longfin Action") and *SEC v. Longfin Corp.*, No. 1:19-cv-5296-DLC (the "SEC Meenavalli Action").

Plaintiffs believe that further substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.  Many of the facts supporting the allegations contained herein are known only to Defendants or are exclusively within their control.

## NATURE OF THE ACTION

1.    This is a federal securities class action on behalf of all investors who purchased Longfin's Class A common stock (the "Class A Stock" or "Class A Share(s)") between December 13, 2017 and April 6, 2018, inclusive (the "Class" who purchased Class A Stock on the open

market during the "Class Period"), and were damaged thereby.[1]  Longfin's Class A Stock was listed and traded on the NASDAQ Capital Market ("NASDAQ") at all relevant times. The Class also contains two subclasses: (1) all persons and entities who purchased Class A Stock directly from Defendants (defined below) and/or purchased Class A Stock on the open market as result of Defendants successfully soliciting their purchases of such stock during the Class Period (the "Securities Act Subclass"); and (2) all persons who purchased Longfin Class A Shares on the open market contemporaneously with Defendants' insider sales and suffered damages in connection with their respective purchases and sales during the Class Period (the "20A Subclass").

2.      This action seeks to recover damages for violations of the federal securities laws under Sections 12(a)(1) and 15(a) of the Securities Act of 1933 (the "Securities Act") [15 U.S.C. §§77l(a)(1) and 77o(a)] (the "Securities Act Claims") and Sections 10(b), 20(a) and 20A of the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. §§78j(b), 78t(a), and 78t-1(a)], and Rule 10b-5 promulgated thereunder by the SEC [17 C.F.R. § 240.10b-5] (the "Exchange Act Claims"), against Longfin, Venkata S. Meenavalli ("Meenavalli"), Vivek Kumar Ratakonda ("Ratakonda"), Andy Altahawi f/k/a Amro Izzelden Altahwi ("Altahawi," and together with Meenavalli, and Ratakonda, the "Executive Defendants"), Suresh Tammineedi ("Tammineedi"), Dorababu Penumarthi ("Penumarthi," and together with Meenavalli, Ratakonda, Altahawi, and

---

[1]  Excluded from the class are all Defendants (defined below), the present and former officers and directors of the Company, as well as members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which one or more Defendant has or had a controlling interest.

Tammineedi, the "Individual Defendants"), and Network 1 Financial Securities, Inc. ("Network 1") (collectively, "Defendants").[2]

3.      Longfin purports to be a finance and technology ("Fintech") company that specializes in structured trade finance and physical commodities finance solutions and provides blockchain technology solutions for a variety of businesses.

4.      The Company is purportedly headquartered in New York, New York, and its Class A Stock was traded under the ticker symbol "LFIN" on NASDAQ from December 13, 2017 until April 6, 2018 – when the stock's trading was halted.  The Class A Stock resumed trading on the Over the Counter Market ("OTC") on May 24, 2018.

5.      The Securities Act Claims are based on Defendants' unlawful solicitation, offer, and sale of unregistered securities in violation of Section 5 of the Securities Act.  By way of example, during the Class Period, Defendants participated and enabled the unlawful solicitation, offer, and/or sale by Defendants Altahawi, Tammineedi, and Penumarthi of, at minimum, 645,000 shares of unregistered Class A Stock to the investing public in non-exempt transactions which yielded tens of millions of dollars in profit for themselves.

6.      The Securities Act's registration requirements are designed to protect investors by ensuring they are provided adequate information upon which to base their investment decisions. Absent registration, issuers of securities are able to tout their investment opportunities with no limitations whatsoever.  For example, an issuer could omit any information that would make a potential investor think twice before investing (*e.g.*, conflicts of interest or major setbacks to core product lines), or peddle its securities using unbounded exaggerations regarding the progress of its

---

[2] Plaintiffs' Section 20A claim is only alleged against Defendants Altahawi, Tammineedi, and Penumarthi.

3

product development, business plan, and business strategies, or even fabricate the existence of relationships with vendors or other business partners (*e.g.*, issuing 2.5 million of a company's publicly traded common stock in a related party transaction to acquire a purportedly valuable asset -- which is later revealed to have been valued by the company itself at $0).

7.     Due to the varied and innumerable ways in which investors can be, and are likely to be, manipulated and harmed absent any of the protections under the federal securities laws, Sections 5 and 12(a)(1) of the Securities Act provide for strict liability against any person who offers or sells an unregistered security.  As detailed herein, none of Longfin's securities have been registered under the Securities Act, and at least 645,000 Class A Shares sold by Defendants Altahawi, Tammineedi and Penumarthi were not transferred pursuant to any exemption from registration.  Therefore, these transactions were made in direct violation of the Securities Act's registration requirements.

8.     The Exchange Act Claims are based on Defendants' fraudulent and manipulative scheme to enrich themselves and their affiliates by: (1) creating a public market for Longfin's securities; (2) artificially inflating the Class A Shares' trading price by issuing numerous false or misleading statements of fact, failing to disclose material information to public investors, and, with respect to at least one of the Individual Defendants (Altahawi), engaging in wash trades designed to simulate market activity; and (3) unlawfully engaging in insider trades and selling their Class A Shares at artificially inflated prices.

9.     For example, Defendants inflated the trading price of Class A Shares by making materially false and misleading statements or omitting material statements of facts concerning, *inter alia*: (i) Longfin's eligibility to list its Class A Stock on NASDAQ; (ii) the location of the Company's principal place of business and compliance with requirements to conduct a public

offering under Regulation A; (iii) the number of Class A Shares issued pursuant to the Regulation A Offering; (iv) Longfin's Class A Stock's public float; (v) the Company's acquisition of Ziddu.com from Meridian Enterprises Pte. Ltd. ("Meridian Enterprises") and related party transactions attendant thereto; (vi) Ziddu.com's involvement with blockchain technologies, operational status, revenue, and value; (vii) the identities and qualifications of Longfin's board members, officers, and key employees; (viii) material weaknesses in the Company's internal controls over financial reporting and operations; (ix) the Company's operations and profitability; and/or (ix) the fact that the Company was ineligible for inclusion in the FTSE Russell ("Russell") indices.

10.     Each of Defendants' misrepresentations and omissions were material because they were designed to, and did, entice the public into purchasing unregistered securities (Class A Shares) which were nothing but a vehicle for the Individual Defendants' personal enrichment.  As detailed *infra*, when the magnitude of Longfin's fraudulent conduct was revealed, the trading price of Longfin's Class A Stock plummeted.

11.     Defendants' fraudulent and manipulative schemes and false or misleading misrepresentations/omissions were revealed in a series of corrective disclosures during the Class Period.

12.     On March 26, 2018, Citron Research ("Citron"), a market commentator, submitted a post via its Twitter account accusing the Company of inaccuracies in its financial reporting and fraud.  The same day, Russell issued a statement announcing that Longfin would be removed from its global indices after market close on March 28, 2018, approximately 12 days after the Class A Stock had been added.

13.    On March 27, 2018, CNBC published an article entitled "Longfin loses more than a third of its value after the controversial cryptocurrency stock is booted from the Russell 2000 index."

14.    On April 2, 2018, Longfin filed its annual report on Form 10-K for the Company's 2017 fiscal year (the "2017 10-K"). The 2017 10-K revealed for the first time that Longfin was the subject of an SEC investigation (which led to a Court-imposed freeze on $27 million in illicit trading proceeds), suffered from a multitude of material weaknesses in its internal controls over financial reporting, and was subject to a "going concern" qualification from its auditors.

15.    On April 6, 2018, an SEC complaint against Longfin was unsealed and made public, and trading of Longfin's Class A Stock was halted on NASDAQ. On May 5, 2018, the SEC filed an amended complaint against Longfin, Meenavalli, Altahawi, Tammineedi, and Penumarthi. The amended SEC complaint is appended hereto as Exhibit A, and is incorporated by reference. On May 14, 2018, Longfin voluntarily delisted its Class A Stock from NASDAQ by filing a Form 25 with the SEC.

16.    On May 24, 2018, the Company's Class A Stock was officially delisted from NASDAQ. The same day, the Class A Stock began trading on the OTC, with an opening price of $5.05.

17.    Defendants' fraudulent and manipulative conduct, and false or misleading statements and omissions caused the Class A Stock's trading price to surge to a Class Period high of $142.82 on December 18, 2017, only to decline 96.46% to an opening price of $5.05 on May 24, 2018 -- the date on which the stock became a tradeable asset after the April 6, 2018 trading halt.

18.     As a result of Defendants' fraudulent conduct alleged herein, Plaintiffs and the

Class invested in Longfin securities and suffered significant financial harm.  For these reasons,

Plaintiffs on behalf of themselves, and all similarly situated Longfin investors, seek to have a Class

of similarly situated Longfin investors certified, and to recover monetary damages on behalf of the

Class for the harms caused by the wrongful conduct set forth herein.

## JURISDICTION AND VENUE

19.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331 (federal question

jurisdiction), Section 22 of the Securities Act [15 U.S.C. § 77v] because Plaintiffs allege violations

of Sections 12(a)(1) and 15(a) of the Securities Act [15 U.S.C. §§ 77l(a)(1) and 77o(a)], and

Section 27 of the Exchange Act [15 U.S.C. § 78aa] because Plaintiffs allege violations of Sections

10(b), 20(a) and 20A of the Exchange Act [15 U.S.C. §§ 78j(b), 78t(a) and 78t-1(a)].  In connection

with the acts, conduct, and other wrongs alleged herein, Defendants, directly or indirectly, used

the means and instrumentalities of interstate commerce, including the U.S. mails, interstate

telephone communications, the Internet, and the facilities of NASDAQ (a national securities

exchange located in this District).

20.     The Court has personal jurisdiction over each of the Defendants because each either

conducts business and maintains operations in this District or is an individual who either is present

in this District for jurisdictional purposes or has sufficient minimum contacts with this District as

to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play

and substantial justice.

21.     Venue is proper in this District under Section 22 of the Securities Act [15 U.S.C. §

77v], Section 27 of the Exchange Act [15 U.S.C. § 78aa], and 28 U.S.C. § 1391, because: (a) the

conduct at issue took place and had an effect in this District; (b) Defendant Longfin claimed to be

7

headquartered in this District; (c) a substantial portion of the corporate transactions and wrongs complained of herein occurred here; and (d) Defendants have received substantial compensation and other transfers of money here by doing business and engaging in activities having an effect in this District.

## CLASS ACTION ALLEGATIONS

22.    Plaintiffs brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons or entities who purchased Longfin securities on the open market during the Class Period and were damaged thereby.

23.    The Class also contains two subclasses: (1) the Securities Act Subclass: all persons and entities who purchased Class A Stock directly from Defendants and/or purchased Class A Stock on the open market as a result of Defendants' successfully soliciting their purchases of such stock during the Class Period; and (2) the 20A Subclass: all persons who purchased Longfin Class A Shares on the open market contemporaneously with Defendants' insider sales and suffered damages in connection with their respective purchases and sales during the Class Period.

24.    Excluded from the Class are Defendants and other officers and directors of the Company, at all relevant times, as well as members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which one or more Defendant has or had a controlling interest.  The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Longfin's Class A Stock was actively traded on NASDAQ.  While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are thousands of members in the proposed Class.  Upon information and belief, these shares are held by thousands of individuals located geographically throughout the country and possibly the world.

Joinder would be highly impracticable.  Record owners and other members of the Class may be identified from records maintained by Longfin or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

25.     Plaintiffs' claims are typical of those of the Class because Plaintiffs and the Class sustained damages from Defendants' wrongful conduct in a substantially identical manner.

26.     The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would in turn establish incompatible standards of conduct for Defendants.

27.     There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class, which predominate over questions which may affect individual Class members, include whether: (i) Defendants offered and sold unregistered securities to the Class during the Class Period; (ii) Defendants violated the federal securities laws as alleged herein; (iii) Defendants engaged in a fraudulent and manipulative scheme in connection with Longfin's listing on NASDAQ and offer and sale of Longfin securities; (iv) Defendants omitted and/or misrepresented material facts in their publicly disseminated reports, press releases, and statements during the Class Period; (v) Defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading; (vi) Defendants participated and pursued the fraudulent scheme or course of business complained of herein; (vii) Defendants acted purposefully, knowingly, or recklessly in omitting and/or misrepresenting material facts; (viii) the price of Longfin's securities was artificially inflated during the Class Period as a result of the material nondisclosures and/or misrepresentations complained of herein; and (ix) the members of

the Class have sustained damages as a result of Defendants' sale of unregistered securities and/or the decline in value of Longfin's securities when the truth was revealed, and if so, what the appropriate measure of damages is.

28.     Plaintiffs will fairly and adequately protect the interests of the Class and have retained competent counsel experienced in litigation of this nature.  Plaintiffs have no interests antagonistic to or conflicting with those of the Class.  Plaintiffs anticipate that there will be no difficulty in the management of this litigation.

29.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## **PARTIES**

### I.      **PLAINTIFFS**

30.     On June 25, 2018, this Court appointed Mr. Malik to serve as Lead Plaintiff for the class in this class action pursuant to the Private Securities Litigation Reform Act of 1995 ("PSLRA").

31.     As detailed in Mr. Malik's PSLRA certification previously filed in this proceeding, Dkt. No. 16-1, Lead Plaintiff expended $1,801,463.41 to purchase 60,000 shares of Class A Stock at artificially inflated prices during the Class Period and has suffered financial harm as a result thereof.  Lead Plaintiff purchased his Longfin shares on the following dates for the following amounts:

| Date | Quantity | Cost ($) |
|---|---|---|
| 12/22/2017 | 10,000 | $395,805.00 |
| 1/17/2018 | 10,000 | $358,905.00 |
| 2/2/2018 | 10,000 | $349,997.00 |

| 2/5/2018 | 10,000 | $319,967.00 |
| 4/5/2018 | 20,000 | $376,789.41 |

32.     As detailed in Mr. Reddy's PSLRA certification previously filed in this proceeding, Dkt. No. 19-2, Plaintiff Reddy expended $163,100.16 to purchase 4,445 shares at artificially inflated prices during the Class Period and suffered financial harm as a result thereof.  More specifically, Mr. Reddy purchased 145 shares on March 23, 2018 for $10,307.5 and 4,300 shares on March 28, 2018 for $152,792.66.

## II.     DEFENDANTS

33.     Longfin Corp. was incorporated in Delaware on February 1, 2017 and purportedly maintains its headquarters in New York, New York.  Longfin's Class A Stock was previously registered under Section 12(b) of the Exchange Act.  The Class A Stock was publicly traded on NASDAQ from December 13, 2017 through April 6, 2018 – when trading in the security was halted.  On May 14, 2018, the Company filed a Form 25 with the SEC to voluntarily delist its stock from NASDAQ.  The Form 25 delisting became effective on May 24, 2018, and on that same date the Class A Stock began trading on the OTC.

34.     Venkata S. Meenavalli ("Meenavalli") is a citizen of India and a resident of the Republic of Singapore.  Meenavalli is Longfin's founder and Chief Executive Officer ("CEO") and Chairman of the Company's board of directors ("Board").  Since Longfin's inception, Meenavalli has controlled well over 50% of Longfin's voting equity.  Meenavalli founded Stampede Capital Limited ("Stampede Capital") and presently he and his wife own approximately 17% of its voting stock.  Stampede Capital owns approximately 27.6% of Longfin's voting equity.

35.     Vivek Kumar Ratakonda ("Ratakonda") was Longfin's Chief Operating Officer until on or about December 11, 2017, on which date Longfin accepted the resignation of its prior

Chief Financial Officer ("CFO") and appointed Ratakonda as the Company's new CFO. Ratakonda has thus served as the Company's CFO at all relevant times. That same day, Ratakonda executed a waiver approving the Company's purchase of Ziddu.com. Ratakonda served as a director of Stampede Capital Ltd. from 2012 until February 2018.

36.     Andy Altahawi f/k/a Amro Izzelden Altahwi ("Altahawi") is a resident of Sunny Isles Beach, Florida and the president and majority owner of Adamson Brothers Corp. Altahawi, through Adamson Brothers Corp., operates ipoflow.com which claims to be a "pioneer in Regulation A+ offerings" and a "leading equity Reg A+ offering platform opening up the IPO access to everyone." Adamson Brothers Corp. is an alter ego of Altahawi's which he uses to, for all intents and purposes, serve as an unregistered broker-dealer purportedly specializing in Regulation A offerings. Altahawi has been employed with various registered broker-dealers. Altahawi became Longfin's Secretary in June 2017 and continued, whether officially or unofficially, until at least late-December 2017.

37.     Suresh Tammineedi ("Tammineedi") is a citizen of India residing in Hyderabad, India. Tammineedi and Meenavalli are affiliated through various business entities. For example, Tammineedi was a director of Stampede Capital Limited (which owns approximately 27.6% of the Company's voting stock). Additionally, until February 2018, Tammineedi was a director of Longfin's subsidiary, Longcom India Pte. Ltd. (f/k/a Longhash Commodity Trading Pte. Ltd.). Tammineedi and Meenavalli have also both served as directors of Kling Enterprises India Ltd. and SpaceNet Enterprises India Ltd.

38.     Dorababu Penumarthi ("Penumarthi") is a citizen and resident of the United Kingdom. Penumarthi's Facebook page has previously stated that he was employed as the "head of Longfin's United Kingdom operations." Additionally, Penumarthi and Meenavalli are affiliated

through Smartahead Solutions Limited, a United Kingdom-based entity where Penumarthi and Meenavalli served together as directors until Meenavalli resigned in June 2013. Penumarthi is currently the sole director at Smartahead Solutions Limited.

39.     Network 1 Financial Securities Inc. ("Network 1") is a subsidiary of Network 1 Financial Group, Inc.  Network 1 is a registered broker-dealer and its main office is located in Red Bank, New Jersey.  Network 1 was engaged as Longfin's Lead Underwriter in connection with the Company's Regulation A Offering.  Longfin's primary points of contact at Network 1 were Damon D. Testaverde and Keith J. Testaverde, both of whom have operated out of Network 1's Red Bank office for over a decade.  Altahawi was registered as a broker-dealer in Network 1's Red Bank Office from 2014–2015.

40.     Defendants Meenavalli, Ratakonda, Altahawi, Tammineedi, and Penumarthi are referenced herein as the "Individual Defendants."  Each of the Individual Defendants: (i) directly participated in the management of the Company; (ii) was directly involved in the day-to-day operations of the Company at the highest levels; (iii) was directly or indirectly involved in drafting, producing, reviewing, and/or disseminating the false and misleading statements alleged herein; (iv) was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or (v) approved or ratified these statements in violation of the federal securities laws.

41.     Because of the Individual Defendants' positions within the Company, they had access to undisclosed information about Longfin's business, operations, operational trends, financial statements, markets, and present and future business prospects via access to internal corporate documents (including the Company's operating plans, budgets and forecasts, and reports of actual operations and performance), conversations and connections with other corporate officers

and employees, and attendance at management and Board meetings and committees thereof and review of reports and other information provided to them in connection therewith.

42.     As officers of a publicly-held company whose securities were registered with the SEC pursuant to Section 12(b) of the Exchange Act, the Individual Defendants each had a duty to disseminate prompt, accurate, and truthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, markets, management, earnings, and present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly traded securities would be based upon truthful and accurate information.  The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

43.     Each of the Individual Defendants is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Longfin's securities by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme: (i) deceived the investing public regarding Longfin's business, operations, and management, as well as the intrinsic value of Longfin securities; and (ii) caused Plaintiffs and other shareholders to purchase Longfin securities at artificially inflated prices.

## SUBSTANTIVE ALLEGATIONS

## I.     LONGFIN'S REGULATION A OFFERING

### A.     Regulation A

44.     Regulation A contains rules for two types of offerings exempt from Section 5's registration requirements: a Tier 1 offering and Tier 2 offering.  Such offerings are meant to authorize certain issuers to conduct public offerings with fewer requirements and costs than would

typically be required for public offerings of securities registered under Section 5 of the Securities Act.  In general terms, to conduct an offering under Regulation A an issuer must first (1) file its Form 1-A a/k/a Offering Statement with the SEC and (2) have its Offering Statement qualified by the SEC.

45.     Once the SEC qualifies an Offering Statement, the terms therein shall apply to securities sold thereunder until the issuer files an amended Offering Statement which is also qualified.  As detailed *infra*, Longfin's Regulation A Offering was qualified for the sale of its Class A Shares for $5.00 per share.  Thus, were Longfin to sell its Class A Shares for any other price (for example, for $0 per share, as was actually the case here), such sales would be outside of (and not pursuant to) the terms of the qualified offering statements and not afforded the Regulation A exemption.

46.     Issuers conducting Tier 2 offerings under Regulation A are also afforded an expedited procedure in which to have their securities traded on public exchanges by, *inter alia*, registering the subject securities under Section 12(b) of the Exchange Act [15 U.S.C. § 78l], complying with the Exchange Act's reporting obligations, and meeting the eligibility standards for initial listing on a public exchange.

47.     As noted, and discussed in detail below, Longfin conducted a Tier 2 offering under Regulation A.

B.     **Longfin's Incorporation and Initiation of the Regulation A Offering**

48.     On February 1, 2017, Longfin was incorporated as a Delaware corporation with Meenavalli named as its CEO.  That same day, Longfin entered into a consulting agreement (the "Consulting Agreement") with Adamson Brothers Corp. – Altahawi's company -- pursuant to which Altahawi would assist Longfin with initiating a Tier 2 offering under Regulation A and

provide services such as personally drafting an offering for Longfin's securities "for up to $50 million."

49.    In exchange for Altahawi's services, the Company agreed to provide "Altahawi/Adamson Brothers" compensation, including, "3% equality [sic] of the company's outstanding shares pre-offering covering the above."

50.    On March 10, 2017, Longfin filed its first Form 1-A, which announced its intent to conduct a Tier 2 offering under Regulation A.  This Form 1-A also stated that under the Consulting Agreement, Altahawi would receive 3% of the issued shares "after the successful completion of fund raising."  Additionally, this Form 1-A also announced an agreement Longfin had entered into with Stampede Tradex Pte Ltd. pursuant to which Longfin would provide 100 million shares of Longfin's common stock to Stampede Tradex Pte Ltd.'s owners (*i.e.*, 55% to Stampede Capital Limited and 45% to Meenevalli).  Stampede Tradex Pte Ltd. would subsequently be renamed Longfin Tradex Pte Ltd.  The Form 1-A filing also attached audited financial statements for Stampede Tradex Pte Ltd. for the month of February 2017.  These statements were the only audited financial statements provided for Longfin during the Regulation A Offering and throughout the Class Period until the Company filed its 2017 10-K on April 2, 2018.[3]

51.    Longfin filed amended Form 1-A's on March 13, 2017, April 18, 2017, May 12, 2017, May 22, 2017, and May 23, 2017.

52.    In June 2017, Altahawi became Longfin's secretary.  Additionally, Altahawi's daughter began working for Longfin, in which capacity she opened bank accounts in Longfin's name and obtained a lease of shared office space in New York.

---

[3] Longfin failed to disclose the fact that Meenavalli also held a substantial ownership in Stampede Capital Limited. This fact was not disclosed until April 2, 2018.

53.     On June 15, 2017, as Longfin's corporate secretary, Altahawi amended the Company's bylaws to reclassify Longfin's common stock into different classes, *to wit*: Class A, Class B, and Class C.  Pursuant to this split, the Company's common stock was divided into three pools: 100 million shares of Class A Stock, 75 million shares of Class B common stock and 25 million shares of Class C common stock.  The primary difference between the new classes was their respective voting rights – Class A Shares received 1 vote per share; Class B common stock received 10 votes per share; and Class C common stock did not have any voting rights.

54.     On June 16, 2017, the SEC qualified Longfin's Amended Form 1-A filed May 23, 2017, which permitted an offering of up to 10 million shares of the Company's Class A Stock for $5.00 per share.

55.     On June 19, 2017, the Company consummated its transaction to acquire Stampede Tradex, pursuant to which Stampede Capital Limited received 27.5 million shares of Class A Stock and Meenavalli received 22.5 million shares of Class B common stock.  Stampede Tradex thereafter became a wholly-owned subsidiary of Longfin.

56.     In late June 2017, Meenavalli received an executed engagement letter from Network 1 which outlined certain terms of their engagement as proposed lead underwriter for Longfin's Regulation A Offering.

57.     Over the following months, Longfin issued numerous Amendments to its Post-Qualification Offering Circular (the "POS").  On August 31, 2017, Longfin filed its fourth Amendment to the POS (the "POS 4") containing the Company's Underwriting Agreement with Network 1, dated August, 21, 2017.  Network 1 was officially retained as lead underwriter for the Regulation A Offering.

58.     On November 3, 2017, Longfin's ninth – and final -- amendment to the POS was filed (the "POS 9").  The POS 9 received qualification from the SEC on November 22, 2017.  The POS 9 qualified Longfin to conduct a Regulation A Tier 2 offering of up to 10 million Class A Shares for $5.00 per share with a minimum purchase amount of 100 shares.

### C.    Longfin Begins Issuing Class A Shares and Seeking Listing on NASDAQ

59.     On September 1, 2017, Longfin issued 31,775 shares to 36 individuals purportedly under its Regulation A Offering.  On this date, Meenavalli informed the Company's transfer agent that all of these individuals were "employees."

60.     From September 1, 2017 through December 6, 2017, Longfin's control log shows that the company issued a total of 67,725 Class A Stock to 261 individual purchasers.  Over the following months, Longfin issued numerous Amendments to its POS.

61.     On September 15, 2017, Altahawi, as corporate Secretary for the Company and a "member of Longfin's board of advisors," signed a Certificate of Corporate Resolution granting the Company's former CFO 3,375,000 shares of Longfin's Class A Stock and himself 2,025,000 shares of Class A Stock.

62.     Longfin submitted its initial application for listing on NASDAQ on August 11, 2017.  Network 1 was officially retained as Longfin's lead underwriter on August 21, 2017.  Altahawi and Network 1, following its retention, were primarily responsible for communicating with NASDAQ regarding Longfin's application for listing.

63.     NASDAQ Listing Rule 5505(a) requires that a Company seeking to list its equity securities have, *inter alia*, at least 1,000,000 publicly-held shares and at least 300 round lot holders, and a market value of the publicly-held shares of at least $5 million.

64.     NASDAQ Listing Rules 5005(a) defines "Publicly Held Shares" as "shares not held directly or indirectly by an officer, director or any person who is the beneficial owner of more than 10 percent of the total shares outstanding. Determinations of beneficial ownership in calculating publicly held shares shall be made in accordance with Rule 13d-3 under the Act"; and a "Round Lot Holder" as "a holder of a Normal Unit of Trading [100 shares]" but that the "number of beneficial holders will be considered in addition to holders of record."

65.     The Company acknowledged the foregoing requirements in various amendments to its POS.  For example, the POS9 stated:

> We anticipate the shares of our common stock will be listed on the Nasdaq Capital Market (under Net Income Standard) under the symbol "LFIN". In order to list, the Nasdaq Capital Market requires that, among other criteria, at least 1,000,000 publicly-held shares of our common stock be outstanding, the shares be held in the aggregate by at least 300 round lot holders, the market value of the publicly-held shares of our common stock be at least $5 million, our stockholders' equity after giving effect to the sale of our shares in this offering be at least $4 million, the bid price per share of our common stock be $4.00 or more, and there be at least three registered and active market makers for our common stock.

66.     On November 15, 2017, NASDAQ informed the Company that, based on the information it had provided and filings with the SEC, Longfin's listing was approved, but the Company was still required to disclose any material changes in circumstance that could impact its eligibility for listing on NASDAQ.

67.     At some point in November 2017, Longfin's former CFO ceased working for the Company.

68.     On November 29, 2017, Altahawi sent an email, with Meenavalli copied, to NASDAQ informing them that Longfin intended to close its offering on December 6, 2017 and list its Class A Stock on December 11, 2017.

69.     On December 4, 2017, Network 1 emailed Altahawi and the Company's transfer agent and requested updated information on issuances under the Regulation A Offerings for its communications with NASDAQ regarding Longfin's proposed listing on December 11, 2017. As alleged by the SEC in the Meenavalli Action, Network 1 "notified [Longfin and Meenavalli] that Longfin had sold only 590,804 shares." *Id*. at 40.

70.     Shortly thereafter, as instructed by Altahawi, the transfer agent provided Network 1 with a list of issuances made under the Regulation A Offering and a reconciliation printout detailing the deposits received for such purchases along with their remittances.

71.     By December 6, 2017, substantially less than 1 million shares of Longfin's Class A Stock were publicly held, and the Company consequently failed to meet NASDAQ's listing requirements.

72.     "Within two days after [Network 1] informed Longfin and Meenavalli of the shortfall in the number of shares sold, Longfin and Meenavalli executed a scheme to distribute hundreds of thousands of shares to company insiders and affiliates to meet the one-million-share threshold." Meenavalli Action at 41. As alleged in the Altahawi Action, "[b]eginning within two days after the Underwriter informed Longfin, Meenavalli, and Altahawi of the shortfall in the number of shares sold, they took a series of steps resulting in hundreds of thousands of shares distributed to 24 individuals on December 6. Altahawi knew or recklessly disregarded that the shareholders who received the shares were company insiders or Meenavalli affiliates." *Id*. at 45.

73.     Rather than delay the Company's application for listing, on December 6, 2017, Meenavalli and Altahawi caused Longfin to issue 409,360 new Class A shares (the "December 6 Shares") to 24 individuals (the "December 6 Shareholders") for $0 in consideration.

74.     More specifically, at 3:19 p.m. on December 6, 2017, Altahawi emailed Longfin's escrow agent, with Meenavalli copied, requesting a phone call and stating: "I need to submit 24 subscriptions we need to issue the shares for as of today please."  By 4:09 p.m. Altahawi provided subscription agreements for each of the 24 December 6 Shareholders to the escrow agent.  Just two hours later, at 6:30 p.m. the transfer agent informed Altahawi and Meenavalli that the issuances were completed.  Shortly thereafter, at 7:40 p.m. Altahawi informed NASDAQ that the Company would close the offering on December 7, 2017 and requested that the Company's Class A Stock be listed on December 13, 2017.

75.     In short, on December 6, 2017, within a span of less than four hours, Altahawi and Meenavalli caused Longfin to issue 409,360 non-exempt restricted Class A Shares, for free, to 24 affiliated individuals, including:

Defendant Tammineedi: former director of Stampede Capital Limited and executive director of Longfin's subsidiary Longcom India Pte.  Ltd. until February 2018;

Defendant Penumarthi: self-proclaimed head of Longfin's United Kingdom operations;

Defendant Ratakonda: Longfin's CFO;

Two of Ratakonda's family members;

Gaddi Linga Murthy: Longfin's Chief Technology Officer;

Emmanuel Dasi: Longfin's Chief Information Officer and Stampede Capital Limited's former CIO;

Prathipati Parthasarathi: Stampede Capital Limited's former CFO and Executive Director;

Karimgam Avinash: Stampede Capital Limited's former Executive Director;

Satya Srikanth Karaturi: Director of Spacenet Enterprises India Limited, Kling Enterprises India Limited, and Stampede Enterprises India Private Limited; and

<u>Vasudeva Rao Maraka</u>: Director of Operations for Meridian Tech Pte. Ltd.

76.     None of the December 6 Shares were issued pursuant to the Regulation A Offering and the Company's escrow agent received no consideration in exchange for these 409,360 Class A Shares.   Nevertheless, any such shares would not have been deemed "publicly held" for NASDAQ's listing requirements.

77.     On December 7, 2017, Altahawi sent an email to Network 1 attaching the updated shareholders list including the December 6 Shareholders and stated: "Let's close on the offering later today to issue the remaining shares and break escrow tomorrow."  Shortly thereafter, Network 1 requested that Altahawi confirm "the list of people that invested in the raise before our deal and proof of Funds received."  In response, Altahawi forwarded Network 1 an email listing the 24 individual December 6 Shareholders and provided bank statements purporting to contain payment information.     As stated in the Altahawi Complaint,[4] "Altahawi forwarded [Network 1] a shareholder list that included the December 6 Shareholders, including Tammineedi and Penumarthi."  *Id*. at 48.

78.     "The December 6 shares were restricted shares in the hands of the December 6 Shareholders.  In fact, these shareholders never paid for their shares.  As a result, the share transfers were unregistered distributions outside the Regulation A offering qualified by the SEC.  These shares were not eligible to be included in the public float number and market value of publicly held shares for NASDAQ listing purposes."  Altahawi Compl. at 48.

79.     None of the December 6 Shareholders paid for these issuances and the bank statements therefore did not actually constitute "proof of Funds received."  Accordingly, Network

---

[4] The term "Altahawi Complaint" or "Altahawi Compl." refers to the Second Amended Complaint filed in the SEC Longfin Action, Dkt. No. 95.

1 knew or was reckless in not knowing that the December 6 Shares were not lawfully issued. Moreover, the list of names included individuals Network 1 must have known were affiliated with the Company – such as Defendant Ratakonda – and thus could not be deemed to have shares that were "publicly held" for purposes of NASDAQ's listing requirements.

80.    On December 11, 2017, Altahawi represented to NASDAQ with a final list of shareholders and informed them – falsely -- that the Company had sold 1,140,989 Class A shares under its Regulation A Offering between September 1, 2017 and December 11, 2017 and there were 364 shareholders in total.

81.    On December 13, 2017, Longfin's Class A Shares were officially listed on NASDAQ under the ticker symbol "LFIN."

82.    On or about December 21, 2017, Network 1 received requests from seven of the December 6 Shareholders – including Tammineedi and Penumarthi – to open brokerage accounts. In response, it contacted Altahawi to confirm that these shareholders had paid for their shares.   In response, Altahawi again provided bank statements purporting to show their purchases.  Network 1 knew these shares had not been paid for but opted to turn a blind eye in favor of receiving its commissions and compensation on the offering.  As set forth in *SEC v. Longfin Corp., et al.*, No. 1:18-cv-2977-DLC, Dkt. No. 43-1 ¶44, the two escrow accounts used in connection with the Regulation A Offering and Longfin's PNC Bank account contained "no evidence of payments for the shares issued on December 6, 2017 or around the time that subscription agreements were signed by [the December 6 Shareholders].  In other words, the bank statements Network 1 received did not contain evidence of payments made for the December 6 Shares, and the underwriter must therefore have known that they were not validly issued under the Regulation A Offering.

83.     Pursuant to its underwriting agreement with Longfin, Network 1 was to receive a "7% commission of the gross proceeds from the first 3,000,000 shares sold in [the Regulation A Offering]."  As later disclosed, Network 1 received $438,757 in commissions based on 1,140,989 shares sold.  Network 1's commission was not only greater than 7% but it was also based on an inclusion of the 409,360 December 6 Shares which were not issued pursuant to the Regulation A Offering.

84.     "On January 2, 2018, Meenavalli wrote a letter to [Network 1] in which he falsely stated, in response to [a] request about whether the December 6 Shareholders had paid for their shares, that the December 6 Shareholders had paid for them by transferring funds into Longfin's 'corporate accounts.'  In fact, the December 6 Shareholders did not remit payment for their shares to Longfin's corporate bank accounts, which Meenavalli controlled."  Meenavalli Compl. at 61.[5]

## II.     SALES OF UNREGISTERED LONGFIN CLASS A STOCK ON THE OPEN MARKET IN NON-EXEMPT TRANSACTIONS.

### A.     Altahawi Sells 536,103 Shares of Unregistered Non-Exempt Longfin Class A Stock on the Open Market for a Profit of $29,016,156.34

85.     On January 12, 2018, Altahawi entered into a share purchase agreement to purchase 121,000 Class A shares from ten of the December 6 Shareholders, including two of Ratakonda's family members and Tammineedi, for $30.00 per share (the "Private Transaction").   Each of the 10 individual December 6 Shareholders' signatures were on the same agreement.  Given that these shareholders were located in various locations, the transfer agent contacted Meenavalli to confirm whether they should conduct the transfer.  Meenavalli approved the transfer.

---

[5] The term "Meenavalli Complaint" or "Meenavalli Compl." refers to the initial complaint filed in the SEC Meenavalli Action, Dkt. No. 1.

86.     Because they were issued for a price other than $5 per share (and indeed, were issued for $0 per share), the December 6 Shares were not issued pursuant to the Regulation A Offering.  Accordingly, the shares acquired in the Private Transaction were not exempted from registration requirements and could not be legally sold on the open market.

87.     As noted, Altahawi managed Longfin's Regulation A Offering as part of his duties under his Consulting Agreement with Longfin on February 1, 2017.  Under this agreement, the Company agreed to provide Altahawi with 2,025,000 shares of Class A Stock upon the completion of the Regulation A Offering (the "Consulting Shares").   In September 2017, prior to the Regulation A Offering's completion, Altahawi issued himself the Consulting Shares as corporate Secretary of the Company.

88.     The Consulting Shares bore a restrictive legend which would not be lifted until 1 year following the date on which the shares were fully earned/issued – that is, one year from June 2017 if Altahawi's performance was contingent upon the Company attaining its first qualification, or one year from December 2017 if his performance was based on the close of the Regulation A Offering.  Thus, the earliest that the restriction could have been properly lifted would have been June 2018.

89.     Between late February 2018 and early March, Altahawi tried to deposit the Consulting Shares in his personal brokerage account, but the deposit was declined due to the shares containing the restrictive legend.

90.     Accordingly, Meenavalli, on behalf of Altahawi, contacted the Company's transfer agent and requested that they remove the restrictive legend from the Consulting Shares because Altahawi had purportedly fully earned the shares as of February 2017 and a full year had passed.

At Meenavalli's instruction, the transfer agent removed the restrictive legend from the Consulting Shares.

91.     Following the removal of the restrictive legend, Altahawi controlled over 60% of the public float.

92.     Between February 8, 2018 and March 29, 2018, Altahawi sold 536,103 Longfin shares on the open market and received a profit of approximately $29,016,156.34.   Altahawi's sales were not exempt from registration.   Accordingly, these sales were made in direct violation of Section 5 of the Securities Act.

93.     In the process of selling the December 6 Shares he acquired through the Private Transaction and portions of his Consulting Shares, Altahawi engaged in dozens of wash trades designed to simulate market activity by raising Longfin's trading volume to artificially inflate and/or prop up its trading price.   For example, the following screenshot of Altahawi's brokerage account exhibits clear manipulative trading patterns by way of wash trades:

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| LFIN | 2018-03-22, 10:44:07 | 54 | 58.4000 | 64.5000 | -3,153.60 | -1.00 | 3,154.60 | 0.00 | 329.40 |
| LFIN | 2018-03-22, 10:44:12 | -54 | 58.5500 | 64.5000 | 3,161.70 | -1.08 | -2,305.80 | 854.82 | -321.30 |
| LFIN | 2018-03-22, 10:44:39 | -51 | 58.7000 | 64.5000 | 2,993.70 | -1.08 | -2,177.70 | 814.92 | -295.80 |
| LFIN | 2018-03-22, 10:52:36 | 51 | 58.5500 | 64.5000 | -2,986.05 | -1.00 | 2,987.05 | 0.00 | 303.45 |
| LFIN | 2018-03-22, 10:52:46 | 54 | 58.4000 | 64.5000 | -3,153.60 | -1.00 | 3,154.60 | 0.00 | 329.40 |
| LFIN | 2018-03-22, 10:54:48 | -54 | 58.5500 | 64.5000 | 3,161.70 | -1.08 | -2,305.80 | 854.82 | -321.30 |
| LFIN | 2018-03-22, 10:56:12 | -51 | 58.7000 | 64.5000 | 2,993.70 | -1.08 | -2,177.70 | 814.92 | -295.80 |
| LFIN | 2018-03-22, 11:14:55 | 51 | 58.5500 | 64.5000 | -2,986.05 | -1.00 | 2,987.05 | 0.00 | 303.45 |
| LFIN | 2018-03-22, 11:16:10 | 54 | 58.4000 | 64.5000 | -3,153.60 | -1.00 | 3,154.60 | 0.00 | 329.40 |
| LFIN | 2018-03-22, 11:18:42 | -54 | 58.5500 | 64.5000 | 3,161.70 | -1.08 | -2,305.80 | 854.82 | -321.30 |
| LFIN | 2018-03-22, 11:20:01 | 54 | 58.4000 | 64.5000 | -3,153.60 | -1.00 | 3,154.60 | 0.00 | 329.40 |
| LFIN | 2018-03-22, 11:20:08 | -54 | 58.5500 | 64.5000 | 3,161.70 | -1.08 | -2,305.80 | 854.82 | -321.30 |

94.    Altahawi engaged in dozens of these trades, subjecting him to additional liability for actively manipulating Longfin's trading price.

95.    Additionally, Altahawi sold these shares while in possession of material non-public information, and had a duty to disclose the truth of the material non-public information or abstain from trading.   The material non-public information he possessed included the facts that: (a) Longfin was not headquartered in New York; (b) Longfin's Regulation A offering was a sham, and none of the shares it issued were actually issued pursuant to the Regulation A offering, but instead were issued for $0 per share in consideration to insiders and their affiliates; (c) Longfin was not qualified for listing on NASDAQ, and had obtained such listing under false and fraudulent pretenses; (d) Ziddu.com was a worthless shell that had no valuable expertise, operations, or ongoing business associated with blockchain technology; (e) Longfin had material weaknesses in its operations and internal controls over financial reporting; (f) Longfin's purported public float

was severely inflated by the unregistered, non-exempt Class A Stock Defendants illegally introduced into the public market and numerous Class A Shares held by Defendants' affiliates; and (g) Longfin suffered financial losses which imperiled its ability to continue as a going concern.

**B.**     **Tammineedi Sells 2,200 of the Unregistered Non-Exempt December 6 Shares for a Profit of $127,335**

96.     Tammineedi was one of the December 6 Shareholders.  As part of the issuance, he received 30,000 shares from the Company at no cost.  These shares were not issued under the Regulation A Offering.

97.     Between February and March 2018, Tammineedi sold 2,200 of the 30,000 Class A Shares he received as part of the December 6 issuance.  These sales were made on the open market and yielded a profit of $127,335 for Tammineedi.

98.     Tammineedi sold these shares while in possession of material non-public information and had a duty to disclose the truth of the material non-public information or abstain from trading.   The material non-public information he possessed included the facts that: (a) Longfin was not headquartered in New York; (b) Longfin's Regulation A offering was a sham, and none of the shares it issued were actually issued pursuant to the Regulation A offering, but instead were issued for $0 per share in consideration to insiders and their affiliates; (c) Longfin was not qualified for listing on NASDAQ, and had obtained such listing under false and fraudulent pretenses; (d) Ziddu.com was a worthless shell that had no valuable expertise, operations, or ongoing business associated with blockchain technology; (e) Longfin had material weaknesses in its operations and internal controls over financial reporting; (f) Longfin's purported public float was severely inflated by the unregistered non-exempt stock Defendants illegally introduced into the public market and numerous shares held by Defendants' affiliates; and (g) Longfin suffered financial losses which imperiled its ability to continue as a going concern.

28

99.    Tammineedi's sales were not exempt from registration and in direct violation of Section 5 of the Securities Act.

**C.    Penumarthi Sells 39,200 of the Unregistered Non-Exempt December 6 Shares for a Profit of $1,531,187.39**

100.    Penumarthi received 40,000 Class A Shares in connection with the December 6 issuance.  These shares were issued for $0, and thus not issued under the Regulation A Offering.

101.    On January 23, 2018, Penumarthi sold 4,000 of the December 6 Shares for a Profit of approximately $169,495.  Shortly thereafter, Penumarthi sold 35,800 of the shares for a profit of approximately $1,361,692.39.

102.    Penumarthi retained the remaining 200 shares he received on December 6, 2017.

103.    Penumarthi's sales were not exempt from registration and in direct violation of Section 5 of the Securities Act.

104.    Penumarthi sold these shares while in possession of material non-public information, and had a duty to disclose the truth of the material non-public information, of abstain from trading.   The material non-public information he possessed included the facts that: (a) Longfin was not headquartered in New York; (b) Longfin's Regulation A offering was a sham, and none of the shares it issued were actually issued pursuant to the Regulation A offering, but instead were issued for $0 per share in consideration to insiders and their affiliates; (c) Longfin was not qualified for listing on NASDAQ, and had obtained such listing under false and fraudulent pretenses; (d) Ziddu.com was a worthless shell that had no valuable expertise, operations or ongoing business associated with blockchain technology; (e) Longfin had material weaknesses in its operations and internal controls over financial reporting; (f) Longfin's purported public float was severely inflated by the unregistered non-exempt Class A Stock Defendants illegally

introduced into the public market and numerous Class A Shares held by Defendants' affiliates; and (g) Longfin suffered financial losses which imperiled its ability to continue as a going concern.

## III.   ADDITIONAL INSIDER TRADES

105.   On December 13 and December 14, Defendant Tammineedi, through his company Source Media, purchased 67,000 shares of Longfin for an average of $5.48 per share on the open market.  As detailed *infra*, within days of Longfin's listing, its price skyrocketed as a result of Longfin's false and misleading statements regarding a purported blockchain related asset. Tammineedi sold these shares for approximately $2.7 million in profits and executed most of these shares within days of the December 14 Press Release (Defined below).  Tammineedi copied Meenavalli on his emails regarding the brokerage account he opened and used to deposit Longfin shares and execute these transactions.

106.   Tammineedi's purchases and sales were undoubtedly executed on the basis of inside information.  Tammineedi was an executive employee with the Company and thus had a duty to either refrain from executing these trades or disclose the inside information publicly, and his failure to do so constitutes a material omission of material fact.  The material non-public information he possessed included the facts that: (a) Longfin was not headquartered in New York; (b) Longfin's Regulation A offering was a sham, and none of the shares it issued were actually issued pursuant to the Regulation A offering, but instead were issued for $0 per share in consideration to insiders and their affiliates; (c) Longfin was not qualified for listing on NASDAQ, and had obtained such listing under false and fraudulent pretenses; (d) Ziddu.com was a worthless shell that had no valuable expertise, operations, or ongoing business associated with blockchain technology; (e) Longfin had material weaknesses in its operations and internal controls over financial reporting; (f) Longfin's purported public float was severely inflated by the unregistered

non-exempt Class A Stock Defendants illegally introduced into the public market and numerous Class A Shares held by Defendants' affiliates; and (g) Longfin suffered financial losses which imperiled its ability to continue as a going concern.

## IV.    MATERIALLY FALSE AND MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD

107.    On December 11, just two day prior to the listing of Longfin's Class A Stock on NASDAQ, Longfin's directors accepted the resignation of the Company's former CFO and COO and appointed Ratakonda as CFO.  Additionally, the members of the Board, including Defendant Ratakonda, approved Longfin's acquisition of Ziddu.com from Meridian Enterprises for 2.5 million Longfin Class A Shares.  Meenavalli was believed to have owned approximately 92% of Meridian Enterprises at the time of this transaction.[6]

108.    On December 13, 2017, Longfin's Class A Stock opened at a price of $6.94 per share and closed at $5.17 per share.  That same day,  at 10:00 AM EST, the Executive Defendants caused the Company to publish a press release stating in pertinent part:

> New York, Dec. 13, 2017 (GLOBE NEWSWIRE) -- Longfin Corp. (NASDAQ: LFIN), a leading global FinTech company, announces that it will be traded on the Nasdaq market for the first day after its initial public offering (IPO) under Reg A+ closing on December 8, 2017.
>
> "We are delighted to be the first FinTech company went public through Reg A+ on the Nasdaq market," commented Mr. Meenavalli, Chairman and CEO of Longfin. "We acknowledged the Nasdaq and the Jumpstart Our Business Startups (JOBS) Act for providing micro-cap companies, like us, with great opportunities to raise

---

[6] On July 27, 2018, Meenavalli filed a Form 4 with the SEC that stated the following: (a) Meenavalli had a 97.58% ownership interest in Meridian Enterprises when the Ziddu.com acquisition occurred; (b) following the Ziddu.com acquisition, through his ownership in Meridian Enterprises, he had a pecuniary interest in 2,097,970 Class A Shares; and (c) on July 23, 2018 and July 25, 2018, he sold approximately 92.67% of that interest (carrying a pecuniary interest in 965,515 Class A Shares) in exchange for $5,900,608.  Notably, this was the first Form 4 ever filed on the SEC's EDGAR Database.

capital from the market. We will use the capital we raised during IPO to execute our growth agenda so that we can maximize the shareholder value."

* * * *

About Longfin Corp.
Longfin ("LFIN") is a US-based, global FinTech company powered by Artificial Intelligence (AI) and Machine Learning. The company, through its wholly-owned subsidiary, Stampede Tradex Pte. Ltd., delivers foreign exchange and finance solutions to importers/exporters and SMEs. Currently, Longfin has operations in London, Singapore, Dubai, New York, Miami and India.

109.    Also on December 13, 2017, the Executive Defendants caused the Company to

publish another press release at 3:35 EST, stating:

NEW YORK, Dec. 13, 2017 (GLOBE NEWSWIRE) -- Longfin Corp. (Nasdaq: LFIN), a leading global FinTech company powered by Artificial Intelligence (AI) and Machine Learning, visited the Nasdaq MarketSite in Times Square today in celebration of its initial public offering (IPO) on The Nasdaq Stock Market.

According to a research report of Asian Development Bank (ADB), in 2016, the global trade finance gap is $1.5 trillion. Access to finance is the biggest challenge to small and medium enterprises in developing countries and other frontier markets. Powered by Artificial Intelligence (AI) and Machine Learning, Longfin delivers foreign exchange and finance solutions to importers/exporters and SMEs. Its presence in the world's leading markets enables them to offer clients access to nuances of the local markets while providing gateway to the global markets.

"We are delighted to be the first FinTech company went public through Reg A+ on Nasdaq," commented Mr. Meenavalli, Chairman and CEO of Longfin. "We acknowledged Nasdaq and the Jumpstart Our Business Startups (JOBS) Act for providing micro-cap companies, such as ourselves, with great opportunities to raise capital from the market. We will use the capital we raised during IPO to execute our growth agenda so that we can maximize the shareholder value."

"India's innovation-driven growth has been unprecedented. Its economy boosts transformation within the country and contributes to global development." said Bob McCooey, Senior Vice President, Nasdaq. "As the 2nd IPO completed on Nasdaq by an Indian company since 2010, Longfin embodies the can-do spirit like many entrepreneurs of Nasdaq listed companies. We are excited to partner with them as they continue to grow."

About Longfin Corp.
Longfin ("LFIN") is a US-based, global FinTech company powered by Artificial Intelligence (AI) and Machine Learning. The company, through its wholly-owned

subsidiary, Stampede Tradex Pte. Ltd., delivers foreign exchange and finance solutions to importers/exporters and SMEs. Currently, Longfin has operations in London, Singapore, Dubai, New York, Miami and India.

110.    The December 13, 2017 press releases were materially false and misleading at the time that they were published, because they concealed and omitted the material fact that Longfin had obtained its NASDAQ listing under false and fraudulent pretenses, and Longfin's Class A Stock was actually ineligible for listing on NASDAQ.  Specifically, the Class A Stock failed to satisfy the listing requirements set forth in NASDAQ Listing Rule 5505(a) as described in paragraph 63, *supra*.  Indeed, the December 13, 2017 press releases were further materially false and misleading because they omitted and concealed the material facts that: (a) the Company's entire Regulation A Offering was a sham and all publicly held or traded shares of Class A Stock were issued in non-exempt transactions involving unregistered securities and had been sold to the public improperly and without properly observing the requirements of Regulation A—such as Regulation A's requirement that an issuer conducting an offering thereunder actually be headquartered in the United States or Canada; (b) a significant number of shares in the public float had been granted free of consideration to insiders, who were in turn selling such shares in the marketplace for their own benefit rather than that of the Company; and (c) Longfin was not "a US-based, global fintech company powered by artificial intelligence (AI) and machine learning."

111.    Additionally, the December 13, 2017 press releases were materially false and misleading because the Company had not actually operated out of the United States – let alone New York, as indicated.  Indeed, as reported by in the *Wall Street Journal*, on April 3, 2018, the so-called "headquarters" in New York had space for just three individuals, was completely devoid of representatives, and lacked even basic office equipment.

112.    On December 15, 2017, the Executive Defendants caused Longfin to issue a press release entitled "Longfin Corp acquires Blockchain empowered Global Micro-lending solutions provider Ziddu.com" (the "December 15 Press Release").  This press release stated, in relevant part:

> New York, NY (December 14, 2017) - Longfin Corp. (LFIN:Nasdaq) announces the acquisition of Ziddu.com, a Blockchain technology empowered solutions provider that offers Microfinance Lending against Collateralized Warehouse Receipts in the form of Warehouse Coins to small and medium enterprises (SMEs), processors, manufacturers, importers and exporters using crypto currencies across continents.

> Ziddu Warehouse Coin is a smart contract that enables Importers and Exporters to use their Ziddu coins that are loosely pegged to Ethereum and Bitcoin Crypto Currency. The Importers/Exporters convert offered Ziddu coins into Ethereum and Bitcoin Cryptocurrencies and use the proceeds for their working capital needs.

> ***

> "The advent of Blockchain technology has caught the imagination of the global financial services industry; blockchain is emerging as a technological revolution that we believe is set to disrupt the financial services infrastructure. Crypto currencies such as Bitcoin and Ethereum are expected to act as a global financing currency to avail credit against hard currencies of many emerging markets." Says Venkat Meenavalli, Chairman of Longfin Corp.

> Ziddu intends to use blockchain technology to transform the lives of millions of SME's by providing finance by way of Ziddu coins and through Crypto Currencies such as Ethereum and Bitcoin against their collateralized warehouse receipts. At the end of the contract, Importers/Exporters are expected to realize their proceeds and pay back their funds through Crypto Currencies only. Depending upon the risk profile of the counterparty, the interest will vary between 12% to 48%.

113.    The December 15 Press Release was filed as part of a Form 8-K Longfin filed on December 15, 2018 (the "Ziddu.com 8-K," and together with the December 15 Press Release, the "Ziddu.com Announcements").

114.    The Ziddu.com Announcements contained almost entirely false or misleading representations at the time that they were made.  In fact, the Ziddu.com acquisition and its announcement were the byproduct of Defendants' manipulative and fraudulent scheme to

artificially inflate the Class A Stock's trading price by preying on the investing public's newly found interest in blockchain technology.  In essence, Longfin deceived public investors into believing that it had acquired a valuable asset related to virtual currencies – frequently referred to as cryptocurrencies – and that such asset had already been operating as a provider of "Blockchain technology empowered solutions."

115.    Importantly, the Ziddu.com Announcements were issued at a time when trading prices for virtual currencies had reached all-time record highs across the board.  For example, the trading price of Bitcoin ("BTC") – the most commonly known virtual currency – surged from approximately $900 per BTC in January 2017 to approximately $20,000 per BTC in December 2017, an increase of approximately 11,000%.   Naturally, the investing public quickly became interested in virtual currencies, blockchain technologies, and any potential opportunities to invest in the nascent industry.

116.    Defendants deceptively preyed on this newfound attention with the Ziddu.com Announcements.  For example, the title of the December 14 Press Release describes Ziddu.com as a "Blockchain technology empowered solutions provider."  Similarly, Meenavalli is quoted therein discussing the so-called "blockchain revolution" set to "disrupt the financial services infrastructure."   The foregoing was clearly designed to convince the investing public that Ziddu.com was already operating as a "provider" of blockchain related services.  Such statements were deceptive given that neither Longfin nor Ziddu.com had any operations concerning, prior experience in, or involvement with blockchain technology.  In fact, Longfin's acquisition was merely an acquisition of assets such as the domain www.ziddu.com, Ziddu.com's social media accounts, and its trademarks.

117.    The Ziddu.com Announcements also deceived the investing public with their

description of the "Ziddu Warehouse Coin" (the "Ziddu Coin") which purportedly had a value "loosely pegged" to Bitcoin and Ethereum.  This representation misled investors into believing that the value of Ziddu.com had some correlation to the value of BTC and Ethereum, both of which experienced exponential growth in recent months.  In reality, the Ziddu Coin has never had any value – let alone a value pegged to BTC or Ethereum.

118.    As revealed for the first time in Longfin's Form 10-K annual report filed on April 2, 2018 (the "2017 10-K"), Ziddu.com had no revenue or value whatsoever at the time of its acquisition.  Indeed, Longfin recorded Ziddu.com's value as $0 – a fact which unquestionably would have been material to Longfin investors when the acquisition was announced.  However, such information  was not revealed until the filing of the 2017 10-K, which stated:

> On December 11, 2017, the Company issued 2,500,000 shares of its Class A Common Stock in connection with the purchase of the website www.Ziddu.com and all of its respective content and intellectual property rights (the "Ziddu"), from Meridian Enterprises Pte. Ltd., ("Meridian") a company owned 92% by Mr. Meenavalli. ***The acquisition of the Ziddu has been accounted for as an asset acquisition between entities under common control and was recorded at Meridian's historical carrying value of $0 (zero).*** The website and related content and intellectual property comprised substantially all of the value acquired. ***Meridian had not recognized revenue related to Ziddu historically***.

(Emphasis added).

119.    Accordingly, Longfin's representations relating to the Ziddu.com acquisition were false and/or misleading.

120.    Additionally, the Ziddu.com Announcements referenced the fact that Longfin's Class A Shares were traded on NASDAQ under the ticker symbol LFIN.  However, the Ziddu.com Announcements were rendered materially misleading because they concealed and omitted the material fact that Longfin had obtained its NASDAQ listing under false and fraudulent pretenses, and Longfin's Class A Stock was actually ineligible for listing on NASDAQ.  Specifically, the

Class A Stock failed to satisfy the listing requirements set forth in NASDAQ Listing Rule 5505(a) as described in paragraph 63, *supra*.

121.    In the days following issuance of the Ziddu.com Announcements, the price of Longfin's Class A Stock increased from $5.39 per share on December 14, 2017, to a Class Period high of $142.82 on December 18, 2017, representing an increase of more than 2,500% in just three trading days, due to Longfin's fraudulent and manipulative conduct and false or misleading statements and omissions.

122.    Thereafter, the price of Class A Stock precipitously declined, eventually falling 96.46% to an opening price of $5.05 on May 24, 2018 – the date on which the stock became a tradeable asset after the April 6, 2018 trading halt.

123.    On January 23, 2018, Longfin filed a Form 8-K with an appended press release that had been issued earlier that day by the Company, entitled "Multibillion Dollar Fund to Invest $52.7 million into Longfin Corp."  This press release stated, in relevant part:

> New York, Jan. 23, 2018 (GLOBE NEWSWIRE) -- Longfin Corp. ("Longfin" or the "Company") (NASDAQ: LFIN) a leading global FinTech company, has announced that the Company has entered into a securities purchase agreement with a multibillion dollar fund. The institutional investor is investing $52,700,000 through convertible note instruments (the "Notes"). A press release regarding the transaction was previously issued prior to finalization of the documentation earlier today, and the Company is confirming the transaction is proceeding on the terms indicated below.
>
>          Joseph Gunnar & Co., LLC is acting as placement agent.
>
> ***
>
> **Key Transaction Details**
>
> The Notes consist of (i) Series A Senior Convertible Notes in the aggregate principal amount of $10,095,941.18 and (ii) Series B Senior Secured Convertible Notes in the aggregate principal amount of $42,604,058.82. The nature of the investment will involve (i) an upfront cash payment in the amount of $5,000,000, and (ii) secured promissory notes payable by the investors to the Company in the

aggregate principal amount of $42,604,058.82 (referred to below as the "Investor Notes"). Under the Investor Notes, the Investors are required to prepay the Investor Notes to the Company in two equal installments following the registration of all of the shares underlying the Investor Notes and warrants issued together with the Investor Notes.

Longfin is one of the few players in the global FinTech space in alternative finance and shadow banking, a $72 trillion industry worldwide.

**"To secure funding from this large institutional investor at current market valuation will enhance the visibility and revenue growth of the company in a rapid way. We are confident in our goal of reaching a 250% revenue growth rate organically, and outnumbering our growth rate in 2017. This funding will also help Longfin in its acquisition endeavors within the Blockchain powered Smart Contracts and FinTech space across the globe," stated Venkat S. Meenavalli, Chairman and CEO of Longfin Corp.**

\*\*\*

About Longfin Corp.

**Longfin Corp (Nasdaq: LFIN) is a US-based, global fintech company powered by artificial intelligence (AI) and machine learning.** The Company, through its wholly-owned subsidiary, Longfin Tradex Pte. Ltd, delivers FX and alternative finance solutions to importers/exporters and SME's. **Ziddu.com owned by the company is the only market place for smart contracts powered by Consensus Settlement Algorithm on ethereum blockchain. Ziddu ethereum ERC20 blockchain Token uses a technology stack in which Smart Contracts run in distributed virtual machines, which in turn run on a Consensus Settlement Algorithm (CSA) providing solutions to warehouse / international trade financing, micro-lending, FX OTC derivatives, bullion finance, and structured products. Currently the company has operations in Singapore, Dubai, New York and India.**

(Emphasis added).

124.    The foregoing statements were false and misleading at the time that they were made because, as revealed in the Amendment to the 2017 10-K (the "2017 10-K/A"), filed on April 19, 2018, it was unlikely that Longfin "**will be able to continue as a going concern unless a significant restructuring of [its] obligations is implemented, either by means of negotiation or through a bankruptcy proceeding.**" (Emphasis in Original).  And again, like the Ziddu.com

Announcement, the January 23, 2018 press release referenced the fact that Longfin's Class A Stock was traded on NASDAQ under the ticker symbol LFIN.   However, like the Ziddu.com Announcements, the January 23, 2018 press release was rendered materially misleading because it concealed and omitted the material fact that Longfin had obtained its NASDAQ listing under false and fraudulent pretenses, and Longfin's Class A Stock was actually ineligible for listing on NASDAQ.   Specifically, the Class A Stock failed to satisfy the listing requirements set forth in NASDAQ Listing Rule 5505(a) as described in paragraph 63, *supra*.

125.   Similarly, the January 23, 2018 press release was also materially false and misleading because it omitted and concealed the material facts that: (a) the Company's entire Regulation A Offering was a sham and all publicly held or traded shares of Longfin's Class A Stock were unregistered and had been sold to the public improperly and without properly observing the requirements of Regulation A—such as Regulation A's requirement that an issuer conducting an offering thereunder actually be headquartered in the United States or Canada; (b) a significant number of shares in the public float had been granted free of consideration to insiders, who were in turn selling such shares into the marketplace for their own benefit rather than that of the Company; and (c) Longfin was not "a US-based, global fintech company powered by artificial intelligence (AI) and machine learning."

126.   Additionally, the January 23, 2018 press release was materially false and misleading at the time that it was published because it omitted and concealed material facts concerning Longfin's business and operations, including the extent of Longfin's capabilities at its New York offices and the identity and qualifications of key employees.   For example, contrary to the statements contained in paragraph 108, the Company had not actually operated out of the United States – let alone New York.   Indeed, as reported by in the *Wall Street Journal*, on April 3,

2018, the so-called "headquarters" in New York had space for just three individuals, was completely devoid of representatives, and lacked even basic office equipment – such as computers—which is objectively bizarre for a purported "fin**tech**" company:



127.    The foregoing can hardly be described as the center of operations for any "***global fintech company***," least of all one which claims to be "***powered by artificial intelligence (AI) and machine learning***."

128.    In short, Longfin's representations regarding its business operations, headquarters in New York, and status as "one of the few players in the global FinTech space in alternative finance and shadow banking, a $72 trillion industry" were grossly false or misleading.  Indeed, as with the Ziddu.com Announcements, Longfin's solicitations throughout the Class Period have primarily consisted of buzz words designed to distract and mislead the investing public into believing that it was actually a financial ***technology*** company involved in exciting industries such

as artificial intelligence or blockchain technology.

129.    Effective March 16, 2018, Longfin was added to the Russell indices as part of Russell's quarterly addition of companies with recent initial public offerings.  This addition significantly increased investor demand for Longfin securities.

130.    On March 22, 2018, Longfin issued a press release entitled "Longfin Corp. Joins Russell 2000® Index and Russell 3000® Index." (the "Russell Press Release") This press release stated, in relevant part:

> Longfin Corp. ("Longfin" or the "Company") (LFIN), a global FinTech company, has announced that it has been added to the Russell 2000® Index and the Russell 3000® Index, effective March 16, 2018, as part of Russell's quarterly additions of companies with recent initial public offerings.
>
> Russell indices are widely used by investment managers and institutional investors for both index funds and as benchmarks for passive and active investment strategies in the U.S. marketplace.
>
> The Russell 3000® Index measures the performance of the largest 3,000 U.S. companies, representing approximately 98% of the investable U.S. equity market. The Russell 2000® Index measures performance of the small-cap segment of the U.S. equity market and is a subset of the Russell 3000® Index.
>
> Venkat S. Meenavalli, Chairman and CEO of Longfin, says "We are pleased that Longfin is included in the Russell 2000® Index. We believe that this inclusion reflects the stockholder value we are building and will help increase Longfin's visibility within the investment community."

131.    The foregoing statements were materially false and misleading at the time they were made because Defendants omitted material adverse facts about the Company's business, operations, and compliance policies.  More specifically, Defendants' statements were false and misleading at the time that they were made because: (i) Longfin had material weaknesses in its operations and internal controls over financial reporting; (ii) Longfin's purported public float – which Russell relied upon in determining that the Company's Class A Stock would be listed in its indices – was severely inflated by the unregistered Class A Shares Defendants illegally introduced

into the public market through non-exempt transactions and numerous shares held by Defendants' affiliates; and (iii) Longfin suffered financial losses which imperiled its ability to continue as a going concern.

132.    For example, contrary to Meenavalli's representations contained in the Russell Press Release that Longfin's "inclusion [in on the indices] reflects the stockholder value we are building," the Company was of little to no "value" to stockholders.  Indeed, once the Company's financial statements had been audited, the Company's substantial financial losses were revealed and there were "substantial doubts" that the Company would continue as a going concern:

> The continuation of the Company as a going concern is dependent upon the ability of the Company to obtain the monies from the Financing and the attainment of profitable operations. These factors, which are not within the Company's control, raise substantial doubt regarding the Company's ability to continue as a going concern. Although it is actively working on obtaining the additional funding pursuant to the Financing, the Company cannot make any assurances that the additional monies will be available to it and, if available, on a timely basis. If the Company is unable to obtain the monies from the Financing, it would negatively impact its business and operations and could also lead to the reduction or suspension of the Company's operations and ultimately force the Company to cease operations. These financial statements do not include any adjustments to the recoverability and classification of recorded asset amounts and classification of liabilities that might be necessary should the Company be unable to continue as a going concern.

133.    Moreover, these statements contained in the Russell Press Release were materially false and misleading at the time that they were made because they omitted and concealed the material facts that: (a) the Company's entire Regulation A Offering was a sham and all publicly held or traded shares of Longfin Class A Stock were unregistered and had been sold to the public improperly and without observing the requirements of Regulation A—such as Regulation A's requirement that an issuer conducting an offering thereunder actually be headquartered in the United States or Canada; (b) a significant number of shares in the public float had been granted free of consideration to insiders, who were in turn selling such shares in the marketplace for their

own benefit rather than that of the Company; (c) Longfin's Class A Stock was not qualified for trading on NASDAQ nor for inclusion in any Russell index; and (d) neither Longfin nor Ziddu.com had any operations concerning, prior experience in, or involvement with blockchain technology.

134.    Due to the foregoing, Defendants' statements regarding Longfin's business, operations, and prospects were materially false and misleading at the time that they were made and at all relevant times.

## V.    THE TRUTH EMERGES IN STAGES

135.    On March 26, 2018, market commentator, Citron, used its Twitter account to post the following statement accusing Longfin of inaccuracies in its financial reporting and fraud: "If you are fortunate enough to get a borrow, indeed $LFIN is a pure stock scheme. @sec_enforcement should not be far behind.  Filings and press releases are riddled with inaccuracies and fraud."

136.    The same day, Russell issued a statement entitled "Longfin Corp (USA): Constituent Deletion Changes in Russel Global Index Series," which stated:

> Longfin (USA, constituent) was included as an IPO in the Russell 2000 index at the March quarterly update on the basis of its IPO filing of 3 November 2017 which stated that up to 10,000,000 Class A common shares would be offered. Subsequently, an SEC filing published on 13 February 2018, immediately prior to the Russell US Index rank date of 14 February 2018 for the quarterly IPO additions, confirmed that up to a maximum of 1,140,000 of the shares offered had been taken up by the public. Consequently FTSE Russell has determined that Longfin failed to meet the minimum 5% free float requirement as at the 14 February rank date. In accordance with the FTSE Russell Recalculation Policy and Guidelines, Longfin will therefore be removed from the Russell Indexes on 28 March 2018 (after the close).

137.    On this news, the trading price of Longfin's Class A Stock declined from $59.28 per share on March 26, 2018 to close at $34.68 per share on March 27, 2018, a decline of more than 41%, on abnormally large volume.

138.    On March 27, 2018, *CNBC* published an article entitled "Longfin loses more than

a third of its value after the controversial cryptocurrency stock is booted from the Russell 2000 index." This article, in relevant part, quotes Meenavalli's response as follows:

> "We are reapplying" for inclusion in the indexes, Longfin CEO Venkat Meenavalli told CNBC in a phone interview Tuesday. He said the stock's free float has increased above the minimum 5 percent as of March 11 due to the expiration of a lockup period on a consultant's stock holdings. As for Citron's negative view, "we are going to take legal action after we file the 10-K" in the next three days, Meenavalli said. "The company is a profitable company, making revenue."

139.    On this news, the trading price of Longfin's Class A Stock declined from $34.68 per share on March 27, 2018 to close at $17.26 per share on March 29, 2018, a decline of more than 50%, on abnormally large volume.

140.    Meenavalli's statement in response to revelations of Longfin's prior manipulative conduct was itself materially false and misleading at the time it was made, because the "expiration of the lockup period on a consultant's" shares was actually a reference to Altahawi's Consultant Shares and Altahawi had at all relevant times been a Longfin affiliate.  Accordingly, the additional 2 million shares released into the market actually served to decrease the free float.  Additionally, the "lockup period" had not expired, rather the Consultant Shares' restrictive legend was improperly and prematurely removed because Meenavalli personally directed the Company's transfer agent to do so.  Moreover, as detailed *supra*, Altahawi's sales of such shares were unregistered non-exempt transactions in violation of the federal securities laws.

141.    Additionally, Meenavalli's statements on March 27, 2018 were materially false and misleading because: (a) Citron's statements were substantially correct in that once the Company was finally audited, it was determined to be unlikely that the Company would "***be able to continue as a going concern unless a significant restructuring of [its] obligations [were] implemented, either by means of negotiation or through a bankruptcy proceeding.***" (Emphasis added); and (b) Longfin was fully aware that its fraudulent conduct had begun unravelling and its threats of legal

action against Citron were empty and meant to obscure the reality that that Citron's allegations were largely correct. Longfin was not a profitable company at any time, and the Company was actually on the verge of receiving a going concern qualification from its auditors.

142.   If not for Meenavalli's additional false and misleading statements on March 27, 2018, the price of Longfin's Class A Stock would have declined even more precipitously.

143.   After market close, on April 2, 2018, Longfin filed its 2017 10-K, which revealed for the first time, *inter alia*, that Longfin: (i) had material weakness in its internal control over financial reporting; (ii) was the subject of an SEC investigation concerning its initial public offering and acquisition of Ziddu; and (iii) may not be able to continue as a going concern.  The 2017 10-K stated, in relevant part:

> ***We have identified several material weaknesses in our internal control over financial reporting. If our planned remediation of these material weaknesses is not effective, or if we experience additional material weaknesses in the future or otherwise fail to maintain an effective system of internal control over financial reporting in the future, we may not be able to accurately or timely report our financial condition or results of operations, which may adversely affect investor confidence in us and, as a result, the value of our securities.***
>
> In connection with the audit of our financial statements beginning on page F-1, the Company identified several material weaknesses in its internal control over financial reporting. A material weakness is defined as a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the Company's financial statements will not be prevented or detected on a timely basis. Below are the material weaknesses identified:
>
> - the Company lacks qualified personnel who fully understand GAAP reporting requirements, possess appropriate skills to identify and determine proper accounting for new, complex or unusual transactions or have a proficiency in the SEC reporting environment;
>
> - the Company did not maintain sufficient personnel with the technical knowledge and skills to perform accounting functions for complex/nonrecurring transactions and financial reporting functions;
>
> - the Company exhibited an overall lack of sufficient knowledge, organized

and sufficient audit support, documented positions and assessments, and policies/procedures related to the accounting treatment for both complex and non-complex transactions;

- certain segregation of duties issues exist (i.e., the same person performs the process and the control in certain areas);

- the Company does not have any formal or documented accounting policies and procedures, including with respect to intangible assets and monitoring related parties;

- senior financial reporting personnel have the ability to make journal entries; and

- there is no formal review process around journal entries recorded.

Neither we nor our independent registered public accounting firm has performed an evaluation of our internal control over financial reporting in accordance with Section 404 of the Sarbanes-Oxley Act. In light of the material weaknesses that were identified, we believe that it is possible that additional material weaknesses and control deficiencies may have been identified if such an evaluation had been performed.

The Company is working to remediate the material weaknesses, has taken steps to enhance the internal control environment, and plans to take additional steps to remediate the material weaknesses. Specifically, we will:

- seek technically competent staff with appropriate experience applying GAAP accounting guidance and are currently utilizing a consultant with US GAAP/SEC experience to assist with financial reporting requirements;

- design additional controls around identification, documentation and application of technical accounting guidance; implement additional internal reporting procedures, including those designed to add depth to the review processes and improve segregation of duties; and

- restructur[e] internal controls to eliminate or improve known control issues.

The actions that we are taking are subject to ongoing senior management review as well as audit committee oversight. Although we plan to complete this remediation process as quickly as possible, we cannot at this time estimate how long it will take, and our efforts may not be successful in remediating these material weaknesses. In addition, we will incur additional costs in improving our internal control over financial reporting. If we are unable to successfully remediate these material weaknesses or if we identify additional material weaknesses, we may not

detect errors on a timely basis. This could harm our operating results, cause us to fail to meet our SEC reporting obligations or NASDAQ Capital Market listing requirements on a timely basis, adversely affect our reputation, cause our stock price to decline or result in inaccurate financial reporting or material misstatements in our annual or interim financial statements.

In addition to the remediation efforts related to the material weaknesses described above, we are in the process of designing and implementing the internal control over financial reporting required to comply with Section 404 of the Sarbanes Oxley Act. This process will be time consuming, costly and complicated. If during the evaluation and testing process, we identify one or more other material weaknesses in our internal control over financial reporting, our management will be unable to assert that our internal control over financial reporting is effective. Even if our management concludes that our internal control over financial reporting is effective, our independent registered public accounting firm may conclude that there are material weaknesses with respect to our internal controls or the level at which our internal controls are documented, designed, implemented or reviewed. If we are unable to assert that our internal control over financial reporting is effective, or when required in the future, if our independent registered public accounting firm is unable to express an opinion as to the effectiveness of our internal control over financial reporting, investors may lose confidence in the accuracy and completeness of our financial reports and the market price of our securities could be adversely affected, and we could become subject to investigations by the stock exchange on which our securities are listed, the SEC, or other regulatory authorities, which could require additional financial and management resources.

*  *  *

**Going Concern**

The Company has limited operating history and experienced a net loss of $26.4 million since its inception. The Company has $2.1 million of cash at December 31, 2017. The Company operates primarily in structured trade finance and providing technology services and our operating costs are primarily related to the cost of providing those services, employee compensation and administrative expenses.

On January 22, 2018, pursuant to a Securities Purchase Agreement ("SPA") entered into by an institutional investor (the "Investor"), the Company agreed to sell and issue (1) (i) Senior Convertible Notes to the Investor in the aggregate principal amount of $52,700,000 (each, a "Note" and collectively, the "Notes"), consisting of a Series A Note in the principal amount of $10,095,941 and (ii) a Series B Note in the principal amount of $42,604,059, and (2) a warrant to purchase 751,894 shares of Longfin Class A Common Stock, exercisable for a period of five years at an exercise price of $38.55 per share (the "Warrant"), for consideration

consisting of (i) a cash payment of $5,000,000, and (ii) a secured promissory note payable by the Investor to Longfin (the "Investor Note") in the principal amount of $42,604,059 (collectively, the "Financing"). On February 13, 2018, the Company completed the Financing and related sale and issuance of the Notes, the Warrant and a placement agent warrant. The maturity date of the Notes is August 13, 2019 and the Investor Note is February 13, 2048. To date, the Company has received $3.7 million in net proceeds ($5.0 million net of costs of $1.3 million) related to the Financing and will not be able to obtain additional monies through the Financing until the Company files a Registration Statement to register the common shares underlying the Notes and Warrant and such Registration Statement is declared effective by the Securities and Exchange Commission or such shares are eligible for resale pursuant to Rule 144 under the Securities Act, or the investor elects to convert or exercise such securities notwithstanding the underlying shares have not been so registered or are then so eligible.

> *The continuation of the Company as a going concern is dependent upon the ability of the Company to obtain the monies from the Financing and the attainment of profitable operations.* These factors, which are not within the Company's control, raise substantial doubt regarding the Company's ability to continue as a going concern. Although it is actively working on obtaining the additional funding pursuant to the Financing, the Company cannot make any assurances that the additional monies will be available to it and, if available, on a timely basis. If the Company is unable to obtain the monies from the Financing, it would negatively impact its business and operations and could also lead to the reduction or suspension of the Company's operations and ultimately force the Company to cease operations. These financial statements do not include any adjustments to the recoverability and classification of recorded asset amounts and classification of liabilities that might be necessary should the Company be unable to continue as a going concern.

* * *

### Legal Matters

The Company is and may become subject to certain legal proceedings and claims arising in connection with the normal course of its business. In the opinion of management, there are currently no claims that would have a material adverse effect on its consolidated financial position, results of operations or cash flows. On March 5, 2018, the Division of Enforcement of the SEC informed the Company that it is conducting an investigation In the Matter of Trading in the Securities of Longfin Corp. and requested that the Company provide certain documents in connection with its investigation, including documents related to our IPO and other financings and the acquisition of Ziddu.com. The Company is in the process of responding to this document request and will cooperate with the SEC in connection with its investigation. While the SEC is trying to determine whether there have been any violations of the federal securities laws, the investigation does not mean that

48

the SEC has concluded that anyone has violated the law. Also, the investigation does not mean that the SEC has a negative opinion of any person, entity or security.

(Emphasis added).

144.    Also on April 2, 2018, the *Wall Street Journal* published an article entitled "Up-and-Down IPO Longfin Is Facing an SEC Probe."  This article stated that Longfin had "failed to disclose important information and left a trail of misstatements behind," which ultimately led to the SEC's investigation.  Additionally, the article revealed various misrepresentations regarding Longfin and its financial filings, including the identity of key employees, the extent of operations at its downtown Manhattan principal offices, and even Meenavalli's age.  Specifically, the article stated:

> Longfin Corp. LFIN 3.82% took advantage of post-financial-crisis rules designed to create jobs and help young companies go public. But the financial-technology company, which was valued at $5.4 billion as recently as 10 days ago, is now under investigation by the Securities and Exchange Commission after it failed to disclose important information and left a trail of misstatements behind.
>
> Since Longfin's December initial public offering, which raised $5.7 million, the company's price first rose 13-fold, then fell by 80%, all in less than four months. In the run-up to the IPO, the company, which says it operates computer platforms for trading on the Singapore and other stock exchanges, failed to disclose important information and misstated facts as basic as the age of its controlling shareholder, according to a review of securities filings.
>
> On Monday, the company disclosed the SEC probe while also reporting material weaknesses in financial controls. The company, which said it is cooperating with the probe, said it may not be able to continue as a going concern.
>
> The shares closed Monday down 17% at $14.31, above its IPO price of $5.
>
> Longfin went public using a provision of the Jumpstart Our Business Startups Act of 2012, known as Reg A+. The rules allow companies with less than $1 billion in annual sales to bypass some accounting and disclosure requirements imposed on bigger companies, but they do require accurate reporting.
>
> The other nine Reg A+ IPOs that have listed on U.S. exchanges or been issued over the counter have lost more than half their value on average, Dealogic data show.

Concerns about Longfin shine a light on the apparent ease with which IPOs are being approved under the Reg A+ regime, lawyers said. "Everyone understood we were rationalizing the disclosures [required] but nothing as flimsy as what appears to have happened here," said James Cox, a law professor at Duke University. "We're going to look back on Reg A+ and think this was an experiment that didn't get managed very well."

The SEC gave Longfin the green light to sell shares based on one month's audited financial statements, which showed that 96% of the company's expenses were paid to a company controlled by Longfin's owner, Venkat Meenavalli, an Indian entrepreneur. The company also provided two years of audited statements for a Singaporean subsidiary, which generates most of its revenue.

An SEC spokeswoman declined to comment.

Mr. Meenavalli, who says he controls 90% of Longfin shares, told The Wall Street Journal he is "based out of Dubai" but intends to spend 15 days a month in the U.S. He said its sole U.S. office space—a small room with three desks and no computers in a shared-office building in downtown Manhattan that was deserted at 9:30 on a recent weekday morning—is temporary. Longfin plans to open a bigger office in New York and is hiring more U.S. employees, he added.

Mr. Meenavalli rejects any suggestion of financial misconduct, saying short sellers, who have borrowed and sold short almost 15% of the shares available to trade, according to FactSet, are motivated by greed. "They enter into their own fire," he said.

A tiny portion of Longfin shares were sold in the Dec. 13 IPO. Two days later, Longfin disclosed that its chief financial officer and chief operating officer had resigned just before the offering. But on the same day, the company said it had acquired a crypto company, Ziddu.com, from a company controlled by Mr. Meenavalli.

Longfin shares rose more than 1,200% over the next two sessions to a peak value of $72.38.

Mr. Meenavalli is 48 years old, according to records he confirmed in an interview, although in a May 2017 SEC filing he is listed as 45. Described in that filing as "a financial wizard," his biographies for some earlier companies show him having a computer-science degree from Australia's Suffield University. His Longfin biography lists a diploma in international trade finance from Middlesex University in the U.K.

In SEC filings, Longfin reported it had 20 employees in March 2017. The number dropped to two the following month, rose to 15 in July, fell to three in November and was reported as 18 on Monday. A filing in July 2017 listed Sarah Altahawi, 23,

as a New York-based executive. Ms. Altahawi said Monday she is not a company officer, "so that was a mistake."

Her father, Andy Altahawi, said she was a secretary. He was issued 2 million Longfin shares for advising on its IPO, according to filings. He said he "managed the SEC process as a consultant" and didn't act as a banker or underwriter. Mr. Altahawi was listed on Longfin's website as a director until September, when the SEC questioned why he wasn't included in the company's filings.

"I'm not a director...never was—what was online was untrue," he said. Mr. Meenavalli said Mr. Altahawi was an officer for two months but then resigned and declined an invitation to join the board.

At its peak value, Longfin was included for eight trading days in the Russell 2000 small-company stock index, which would draw in some of the $122 billion in funds that follow the index. Short-sellers said Russell made a mistake because just 1.5% of Longfin's shares traded, below the 5% minimum. Russell said it made the decision based on Longfin's IPO disclosures, which said more shares would trade. Its reversal, announced March 26, sent the shares down 41% the next day.

Mr. Meenavalli told the Journal Friday that the company now has a 7% free float thanks to the unlocking of some IPO shares. Mr. Meenavalli said Russell told him "they are going to include us back."

A spokesman for Russell said Longfin would be assessed like any other company during the next quarterly index update. The spokesman also confirmed that the Journal's calculation, based on available information, that only 4% of the shares are available for trading "is accurate."

Mr. Meenavalli said Longfin "went through a stringent process of [approval by] SEC and Nasdaq" and that its filings are being unfairly judged against the tougher standards set for bigger companies.

145.    On this news, the trading price of Longfin's Class A Stock fell from $14.31 per share on April 2, 2018 to close at $9.89 per share on April 3, 2018, a decline of more than 30%, on abnormally large trading volume.

146.    Shortly thereafter, on April 6, 2018, the SEC unsealed a civil complaint pending in this Court involving Longfin and announced that it had obtained a court order freezing more than $27 million in trading proceeds from allegedly illegal distributions and sales of restricted Longfin Class A Stock involving the Company, its CEO and three other affiliated individuals.  This press

release stated, in relevant part:

> According to a complaint unsealed today in federal court in Manhattan, shortly after Longfin began trading on NASDAQ and announced the acquisition of a purported cryptocurrency business, its stock price rose dramatically and its market capitalization exceeded $3 billion. The SEC alleges that Amro Izzelden "Andy" Altahawi, Dorababu Penumarthi, and Suresh Tammineedi then illegally sold large blocks of their restricted Longfin shares to the public while the stock price was highly elevated. Through their sales, Altahawi, Penumarthi, and Tammineedi collectively reaped more than $27 million in profits.

> According to the SEC's complaint, Longfin's founding CEO and controlling shareholder, Venkata Meenavalli, caused the company to issue more than two million unregistered, restricted shares to Altahawi, who was the corporate secretary and a director of Longfin, and tens of thousands of restricted shares to two other affiliated individuals, Penumarthi and Tammineedi, who were allegedly acting as nominees for Meenavalli. The subsequent sales of those restricted shares violated federal securities laws that restrict trading in unregistered shares distributed to company affiliates.

> "We acted quickly to prevent more than $27 million in alleged illicit trading profits from being transferred out of the country," said Robert Cohen, Chief of the SEC Enforcement Division's Cyber Unit. "Preventing Defendants from transferring this money offshore will ensure that these funds remain available as the case continues."

> The SEC's complaint, which was filed under seal on April 4, charges Longfin, Meenavalli, Altahawi, Penumarthi, and Tammineedi with violating Section 5 of th Securities Act of 1933. The complaint seeks injunctive relief, disgorgement of illgotten gains, and penalties, among other relief.

147.     Also on April 6, 2018, NASDAQ announced that trading of Longfin's Class A Stock had been halted in a press release entitled "Nasdaq Halts Longfin Corp." The press release stated:

> The Nasdaq Stock Market® (Nasdaq:NDAQ) announced that trading was halted today in Longfin Corp. (Nasdaq:LFIN) at 10:01:38 Eastern Time for "additional information requested" from the company at a last sale price of $28.189.

> Trading will remain halted until Longfin Corp. has fully satisfied Nasdaq's request for additional information.

148.     Longfin investors had minimal time to react to the announcement of the SEC action

against Longfin and NASDAQ's announcement halting LFIN's trading and, thus, many investors were unable to exit their positions prior to the halt.

149.    After the April 6 trading halt, there was no market for the Company's Class A Stock until May 24, 2018 – when the stock began trading on the OTC and was officially delisted from NASDAQ.

150.    When trading resumed on May 24, it opened at a price of $5.05 per share – a price 96.46% lower than the Class Period high of $142.82.   By the time investors could sell their Class A Stock on the OTC, it had already declined over 96.46% in value from its Class Period high, causing economic losses and damages to Plaintiffs and the Class that are actionable under the federal securities laws.

## CONTROL PERSON ALLEGATIONS

151.    By reason of the Executive Defendants' positions with the Company as executive officers, the Individual Defendants possessed the power and authority to control the contents of Longfin's quarterly reports, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors; *i.e.*, the market.  The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions with the Company and access to material, non-public information available to them but not the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false statements pleaded herein.

152.     For example, Defendant Meenavalli is deemed a control person because he, *inter alia*: (a) was Longfin's Founder and CEO at all relevant times; (b) controlled over 50% of Longfin's voting equity at all relevant times; (c) personally directed and approved the wrongful actions referenced herein; (d) is personally quoted making false and misleading statements; (e) enabled the unlawful issuance of Longfin Class A Stock to the December 6 Shareholders and the unlawful lift of the restrictive legend on Altahawi's Consulting Shares.

153.     Likewise, Defendant Ratakonda is deemed a control person under the federal securities laws because he, *inter alia*: (a) was the Company's CFO and "Principle Accounting Officer" throughout the Class Period; (b) personally authorized Meenavalli's self-dealing transactions—such as Longfin's acquisition of Ziddu.com, which carried a value of $0; and (c) was substantially involved in the unlawful issuance of the December 6 Shares, as evinced by the fact that he and two of his family members were recipients of unlawfully issued shares.

154.     Finally, Defendant Altahawi is deemed a control person because he, *inter alia*, (a) managed the Regulation A Offering alongside Meenavalli from the day the Company was incorporated; (b) personally directed the Company's transfer agent to transact unlawful issuances of Longfin Class A Stock; (c) personally directed the Company's transfer agent to transfer 2.5 million Longfin Class A Shares to Meridian Enterprises for the Company's acquisition of Ziddu.com; and (d) was substantially involved with directing the Company's efforts for listing on NASDAQ.

## THE SECURITIES ACT CLAIMS

155.     These claims, brought under Sections 12(a)(1) and 15 of the Securities Act [15 U.S.C. §§ 77l(a)(1) and 77o], are based solely on allegations of strict liability.

## COUNT I

### Claim for Violation of Section 12(a)(1) of the Securities Act
### on behalf of the Securities Act Subclass
### against All Defendants

156.     Section 12(a)(1) grants Plaintiffs a private right of action against any person who

offers or sells a security in violation of Section 5, and states that such person,

> Shall be liable . . . to the person purchasing such security from him, who may sue
> either at law or in equity in any court of competent jurisdiction, to recover the
> consideration for such security with interest thereon, less the amount of any income
> received thereon, upon the tender of such security, or for damages if he no longer
> owns the security.

157.     Longfin's Class A Stock has never been registered under Section 5 of the Securities

Act and thus could only be sold if an exemption from registration applied.

158.     Longfin issued the December 6 Shares for $0 in consideration during the Class

Period.  Because the Company's Regulation A offering required shares to be sold for $5 per share,

the shares issued for $0 were outside of the ambit of the Company's Regulation A Offering, and

were thus unregistered at all times.

159.     Longfin issued these shares as a result of the Executive Defendants' actions.

Similarly, such issuances would not have occurred but for Network 1's willingness to be paid off,

with commissions on non-existent sales, to ignore the fact that the December 6 Shares had not

been paid for and therefore, were not made under the Regulation A Offering.  Nevertheless,

Network 1 is a statutory seller of the December 6 Shares by virtue of the irrefutable facts that: (1)

the shares were unregistered; (2) the shares were issued in non-exempt transactions; and (3)

Network 1, as underwriter for non-exempt transactions, received financial benefit in the form of

commissions.

160.    The December 6 Shares were thereafter personally sold on the open market by Defendants Altahawi, Tammineedi, and Penumarthi.

161.    Similarly, Defendant Meenavalli lifted the restriction on Altahawi's Consulting Shares and thus, his actions were necessary for Altahawi's sales of unregistered Longfin Class A Shares in non-exempt transactions.

162.    Furthermore, the Company failed to comply with plain language in Regulation A requiring that the Company's actual principal place of business be within the United States or Canada.  Stated otherwise, no shares of Longfin Class A Stock were ever properly issued pursuant to the Company's Regulation A Offering, and therefore, these securities do not qualify for the exemption from registration under Regulation A.

163.    Despite the foregoing, Defendants Altahawi, Tammineedi, and Penumarthi sold at least 645,000 of unregistered non-exempt shares in the public markets, thereby reaping at least $29 million in proceeds from the sales.

164.    Defendants unlawfully made use of means or instruments of transportation or communication in interstate commerce or of the mails for the purposes of offering, selling, or delivering unregistered securities in direct violation of Sections 5(a) and 5(c) of the Securities Act. These means included press releases promulgated through the Internet, emails, and the facilities of NASDAQ.

## COUNT II

**Claim for Violation of Section 15(a) of the Securities Act
on Behalf of the Securities Act Subclass
against the Executive Defendants**

165.    Plaintiffs repeat and re-allege the preceding allegations as if fully set forth herein.

166.     Due to their ownership interest in and control over Longfin, and by virtue of their positions as officers and/or directors and participation in and/or awareness of the wrongdoing complained of herein, the Executive Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision making relating to the wrongdoing complained of herein, including the decision to engage in the sale of unregistered securities as set forth herein.

167.     By virtue of the foregoing, the Individual Defendants are liable to Plaintiffs and the Class as control persons of Longfin under Section 15(a) of the Securities Act.

## THE EXCHANGE ACT CLAIMS

168.     Separate and apart from the Securities Act claims, through their Exchange Act Claims Plaintiffs seek to hold Defendants liable for engaging in a fraudulent and manipulative scheme to create a public market for Longfin's unmarketable securities and artificially inflate the price of Longfin's Class A Stock, as well as for intentionally (or with deliberate recklessness) issuing false and misleading statements and omitting material facts for the purpose of inducing investors to purchase Longfin's Class A Stock.

## SCIENTER ALLEGATIONS

169.     As alleged herein, Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents in violation of the federal securities laws.  As set forth herein, Defendants, by virtue of their possession of information reflecting the true facts regarding Longfin, their control over, and/or receipt and/or modification of Longfin's allegedly

materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning Longfin, participated in the fraudulent scheme alleged herein.

170.     Specifically, the Individual Defendants actually knew and were aware at all relevant times that: (a) Longfin had issued over 400,000 Class A Shares for $0 per share, rather than $5 per share, and thus had issued such stock outside of the ambit of its Regulation A Offering, with such issuances constituting non-exempt transactions in unregistered securities; (b) Longfin's headquarters were not in New York City, but rather were actually in Singapore—where Longfin's largest subsidiary is located; (c) Longfin had falsified key facts in seeking listing of Longfin's Class A Stock on NASDAQ and inclusion of Longfin's Class A Stock in the Russell 2000 index, and actually did not meet the requirements for NASDAQ listing or inclusion in the Russell 2000 index; (d) the Company's finances were on the brink of collapse and the Company's auditors were preparing to render a going concern qualification.

171.     Each of the Individual Defendants were personally involved in the issuance of the December 6 Shares and manipulative scheme to list Longfin's Class A Stock and thereafter manipulate its trading price.  For example, Meenavalli and Altahawi orchestrated the entire issuance themselves and Ratakonda (as well as two of his family members), Tammineedi, and Penumarthi were recipients of December 6 Shares.  Ratakonda, Tammineedi and Penumarthi knew their purchases were unlawful by virtue of the fact that the subscription agreements – which they executed – required them to pay $5.00 per share and none of them paid any compensation for the December 6 Shares.  Network 1 knew the December 6 Shares were not properly issued by virtue of the fact that it explicitly questioned whether they were paid for and received documentation that showed the shares were, in fact, not paid for.

172.    Each of the Executive Defendants knew that Ziddu.com was worthless and was not a "provider" of blockchain-related "solutions."  In fact, it is irrefutable that Meenavalli knew the scope of Ziddu.com's value and operations as he owned 92% of that company prior to its acquisition by Longfin.

173.    Each of the Executive Defendants knew that Longfin's headquarters were not in New York City due to their roles managing and directing the Company.

## LOSS CAUSATION

174.    During the Class Period, as detailed herein, Defendants made false and misleading statements and engaged in a scheme to deceive the market, as well as a course of conduct that artificially inflated the price of Longfin's securities and operated as a fraud or deceit on Class Period purchasers of Longfin securities by materially misleading the investing public.  Later, as the truth about the misleading statements and omissions which artificially inflated the trading price of Longfin's Class A Stock was laid bare to the market over time, the price of Longfin's securities fell precipitously, as set forth herein.  As a result of their purchases of Longfin Class A Shares during the Class Period, Plaintiffs and other members of the Class suffered economic losses—*i.e.*, damages—recoverable under the federal securities laws.

## APPLICATION OF PRESUMPTION OF RELIANCE:<br>FRAUD-ON-THE-MARKET DOCTRINE

175.    At all relevant times, the market for Longfin securities was an efficient market for the following reasons, among others: (i) Longfin Class A Stock was listed and actively traded on NASDAQ, a highly efficient and automated market; and (ii) Longfin regularly communicated with public investors via established communication mechanisms, including regular dissemination of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services.

176.    As a result of the foregoing, the market for Longfin's Class A Stock promptly digested current information regarding Longfin from all publicly available sources and reflected such information in the Class A Stock's trading price.  Under these circumstances, all purchasers of Longfin securities during the Class Period suffered similar injury through their purchase of Longfin's securities at artificially inflated prices, and a presumption of reliance applies.

## NO SAFE HARBOR

177.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions.  In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Longfin who knew that the statement was false when made.

## COUNT III

**Claim for Violation of Section 10(b) of
the Exchange Act and SEC Rule 10b-5
on Behalf of the Class
against All Defendants**

178.    Plaintiffs incorporate by reference each and every preceding paragraph as though

fully set forth herein.

179.    This Count is asserted by Plaintiffs on behalf of themselves and the Class against all the Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder.

180.    During the Class Period, Defendants carried out a plan, scheme, and course of conduct that was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Longfin's securities; and (iii) cause Plaintiffs and other members of the Class to purchase or otherwise acquire Longfin's securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan, and course of conduct, Defendants took the actions set forth herein.

181.    Defendants, by the use of means and instrumentalities of interstate commerce: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements made not misleading; and (iii) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers and acquirers of the Company's securities in an effort to maintain artificially high market prices for Longfin's securities in violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5.

182.    As a result of their making and/or substantial participation in the creation of affirmative statements and reports to the investing public, Defendants had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC, as embodied in SEC Regulation S-K (17 C.F.R. § 229.10, *et seq*.) and other SEC regulations, including accurate and truthful information with respect to the Company's operations and performance so that the market prices of the Company's publicly

traded securities would be based on truthful, complete, and accurate information. Defendants'
material misrepresentations and omissions as set forth herein violated that duty.

183.    Defendants engaged in the fraudulent activity described above knowingly and
intentionally or in such a reckless manner as to constitute willful deceit and fraud upon Plaintiffs
and the Class. Defendants knowingly or recklessly caused their reports and statements to contain
misstatements and omissions of material fact as alleged herein.

184.    As a result of Defendants' fraudulent activity, the market price of Longfin's Class
A Stock was artificially inflated during the Class Period.

185.    In ignorance of the true financial condition of Longfin, Plaintiffs and other
members of the Class, relying on the integrity of the market and/or on the statements and reports
of Longfin containing the misleading information, purchased or otherwise acquired Longfin's
securities at artificially inflated prices during the Class Period.

186.    Plaintiffs and the Class' losses were proximately caused by Defendants' active and
primary participation in Longfin's scheme to defraud the investing public by, among other things,
failing to fully and accurately disclose to investors adverse material information regarding the
Company. Plaintiffs and other members of the Class purchased Longfin's securities in reliance on
the integrity of the market price of these securities, and Defendants manipulated the price of
Longfin's securities through their misconduct as described herein. Plaintiffs and the Class' losses
were a direct and foreseeable consequence of Defendants' concealment of the true financial
condition of Longfin.

187.    Throughout the Class Period, Defendants were aware of material nonpublic
information concerning Longfin's fraudulent conduct (including the false and misleading
statements described herein). Throughout the Class Period, Defendants willfully and knowingly

concealed this adverse information, and Plaintiffs and the Class' losses were the foreseeable consequence of Defendants' concealment of this information.

188.     As a direct and proximate cause of the Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their respective purchases and sales of Longfin's securities during the Class Period.

**COUNT IV**

**Violation of Section 20(a) of
the Exchange Act
on Behalf of the Class
against the Individual Defendants**

189.     Plaintiffs incorporate by reference and reallege each and every allegation above as though fully set forth herein.

190.     During the Class Period, the Individual Defendants were privy to nonpublic information concerning the Company and its business and operations via access to internal corporate documents, conversations and connections with other corporate officers and employees, and attendance at management and Board meetings and committees thereof and review of reports and other information provided to them in connection therewith.  Because of their possession of such information, the Individual Defendants knew or recklessly disregarded the fact that adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.  Plaintiffs and other members of the Class had no access to such information, which was, and remains, solely under the control of the Defendants.

191.     The Individual Defendants were involved in drafting, producing, reviewing, and/or disseminating the materially false and misleading statements complained of herein.  The Individual Defendants were aware (or recklessly disregarded) that materially false and misleading statements were being issued by the Company and nevertheless approved, ratified, and/or failed to correct

those statements in violation of federal securities laws.  Throughout the Class Period, the Individual Defendants were able to, and did, control the contents of the Company's SEC filings, reports, press releases, and other public statements.  The Individual Defendants were provided with copies of, reviewed and approved, and/or signed such filings, reports, releases, and other statements prior to or shortly after their issuance and had the ability or opportunity to prevent their issuance or to cause them to be corrected.

192.    The Individual Defendants also were able to, and did, directly or indirectly, control the conduct of Longfin's business, the information contained in its filings with the SEC, and its public statements.  Moreover, the Individual Defendants made or directed the making of affirmative statements to securities analysts and the investing public at large, and participated in meetings and discussions concerning such statements.  Because of their positions and access to material non-public information available to them but not the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations that were being made were false and misleading.  As a result, the Individual Defendants are responsible for the accuracy of Longfin's corporate releases detailed herein and are therefore responsible and liable for the misrepresentations contained herein.

193.    The Individual Defendants acted as controlling persons of Longfin within the meaning of Section 20(a) of the Exchange Act.  By reason of their positions with the Company, the Individual Defendants had the power and authority to cause Longfin to engage in the wrongful conduct complained of herein.  The Individual Defendants controlled Longfin and all of its employees.  As alleged above, Longfin is a primary violator of Section 10(b) of the Exchange Act and SEC Rule 10b-5.  By reason of their conduct, the Individual Defendants are liable pursuant to

section 20(a) of the Exchange Act.

194.    As a direct and proximate result of the wrongful conduct of Longfin and the Individual Defendants, Plaintiffs and members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

**COUNT V**

**Violation of Section 20A
the Exchange Act
on Behalf of the 20A Subclass
against Defendants Altahawi,
Tammineedi and Penumarthi**

195.    Plaintiffs incorporate by reference and reallege each and every allegation above as though fully set forth herein.

196.    Defendants Altahawi, Tammineedi and Penumarthi orchestrated and participated in an unlawful scheme designed to list unregistered Longfin Class A Stock, manipulate its price upwards with the announcement of the Ziddu.com acquisition, and ultimately sell at least 644,503 unregistered, and non-exempt, Longfin Class A Shares on the open market for which Altahawi, Tammineedi and Penumarthi obtained a collective profit of at least $33,374,678.73 million from insider trades.

197.    As a direct and proximate result of the wrongful conduct of Defendants Altahawi, Tammineedi and Penumarthi, Plaintiffs and members of the Class – who purchased their Class A Shares contemporaneously with Defendants' insider sales during the Class Period – and suffered damages.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs pray for judgment and relief as follows:

A.    Declaring this action to be a class action pursuant to Rule 23 of the Federal Rules

of Civil Procedure and certifying Plaintiffs as Class representatives and their counsel as Class

Counsel;

       B.      Requiring Defendants to pay damages sustained by Plaintiffs and the Class by

reason of the acts and transactions alleged herein;

       C.      Declaring that Defendants offered and sold unregistered securities in violation of

the federal securities laws;

       D.      Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in

this action, including attorneys' fees; and

       E.      Awarding such equitable/injunctive or other relief as the Court may deem just and

proper.

Dated: June 28, 2019

                           Respectfully submitted,

                           **LEVI & KORSINSKY, LLP**

                           */s/ Christopher J. Kupka*

Donald J. Enright                 Christopher J. Kupka (CK-9010)
Elizabeth K. Tripodi             Eduard Korsinsky
John A. Carriel                   55 Broadway, 10th Floor
1101 30th Street, N.W., Suite 115    New York, NY 10006
Washington, DC 20007         Telephone: (212) 363-7500
Telephone: (202) 524-4290     Facsimile: (212) 363-7171
Fax: (202) 333-2121

                           *Attorneys for Lead Plaintiff Mohammad A. Malik*
                           *and Plaintiff Karthik Reddy*